## IN THE SUPREME COURT OF MISSISSIPPI

### NO. 93-CA-00734-SCT

*IN THE MATTER OF THE ENLARGEMENT AND EXTENSION OF THE MUNICIPAL BOUNDARIES OF THE CITY OF JACKSON, MISSISSIPPI: GARY BUNCH, RAY PATTERSON, ERNEST FELKER, C. HUGH MILNER, ET AL., THE OBJECTORS*

*v.*

*CITY OF JACKSON, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/14/93 |
| TRIAL JUDGE: | HON. DENISE SWEET-OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JERRY L. MILLS |
| | DALE F. SCHWINDAMAN |
| ATTORNEY FOR APPELLEE: | DOUGLAS J. GUNN |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 3/27/97 |
| MOTION FOR REHEARING FILED: | 4/18/97 |
| MANDATE ISSUED: | 8/22/97 |

**BEFORE SULLIVAN, P.J., ROBERTS AND SMITH, JJ.**

**ROBERTS, JUSTICE, FOR THE COURT:**

¶1. Jackson, Mississippi's mayor, Kane Ditto, recommended to the City Council that the City annex a total of 24.25 square miles of territory made up of two tracts of land lying south and southwest, respectively, of Jackson's existing corporate limits.[1] The City's Planning Department presented the Planning Board and the City Council a four page document outlining their recommendation for annexing the area. On April 21, 1992, the City Council adopted an ordinance approving the proposed annexation, and a petition of annexation was filed in the Chancery Court of the First Judicial District of Hinds County the next day on April 22, 1992.

¶2. Municipalities within three miles of the proposed annexation area were served with process. The

only named defendants to file answers were the City of Raymond, which objected, and the Town of Terry, which did not. Although the City of Raymond filed an answer objecting to the proposed annexation, it did not appear at trial. The following individuals also filed objections to the proposed annexation by the City of Jackson: Ray Patterson, Gary Bunch, Ernest Felker and C. Hugh Milner.

¶3. The matter was tried before the Honorable Denise Sweet-Owens on January 25-29, 1993; February 8-12, 1993; February 22-24, 1993; and March 4, 1993. On May 14, 1993, the lower court issued a twenty-six page typed opinion, finding the annexation by the City of Jackson of the entire proposed area reasonable. A supplemental opinion was issued on May 27, 1993. Final judgment in favor of the City of Jackson was filed on June 4, 1993. At that time, several of the individual objectors, ("Objectors"), perfected an appeal to this Court, raising the following issues for review:

> **I. WHETHER THE LOWER COURT'S DETERMINATION THAT THE PROPOSED ANNEXATION IS "REASONABLE" PURSUANT TO MISS. CODE ANN. § 21-1-33 (1972) WAS MANIFESTLY WRONG AND UNSUPPORTED BY SUBSTANTIAL OR CREDIBLE EVIDENCE.**
>
> **II. WHETHER THE LOWER COURT ERRED IN FAILING TO CONSIDER THE TOTALITY OF THE CIRCUMSTANCES.**
>
> **III. WHETHER THE LEGAL STANDARD SHOULD BE MODIFIED FOR DETERMINING REASONABLENESS OF A PROPOSED ANNEXATION.**

¶4. After careful review of the record and evidence in this case, we find the chancellor to be manifestly wrong in holding the proposed annexation of Byram by the City of Jackson to be reasonable at this time. Accordingly, we reverse and render.

## STANDARD OF REVIEW

¶5. This Court, in *In the Matter of the Enlargement and Extension of the Municipal Boundaries of the City of Madison, Mississippi: The City of Jackson, Mississippi v. City of Madison,* 650 So.2d 490 (Miss. 1995), gave the following discussion on the chancery court's duty in annexations, and this Court's standard of review in such cases:

> While "[a]nnexation is a legislative affair," confirmation of annexations is in the province of the chancery court. *Matter of the Boundaries of City of Jackson,* 551 So.2d 861, 863 (Miss. 1989); Miss. Code Ann. § 21-1-33 (1972). The role of the judiciary in annexations is limited to one question: whether the annexation is reasonable. *City of Jackson,* 551 So.2d at 863. Courts are "guided" in this determination of reasonableness by twelve factors previously set forth by this Court. This Court recently reaffirmed these twelve "indicia of reasonableness," but held "that municipalities must demonstrate through plans and otherwise, that residents of annexed areas will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." *In the Matter of the Extension of the Boundaries of the City of Columbus,* 644 So.2d 1168, 1172 (Miss. 1994).
>
> The twelve indicia of reasonableness are: (1) the municipality's need to expand, (2) whether the area sought to be annexed is reasonably within a path of growth of the city, (3) potential health

hazards from sewage and waste disposal in the annexed areas, (4) the municipality's financial ability to make the improvements and furnish municipal services promised, (5) need for zoning and overall planning in the areas, (6) need for municipal services in the areas sought to be annexed, (7) whether there are natural barriers between the city and the proposed annexation area, (8) past performance and time element involved in the city's provision of services to its present residents, (9) economic or other impact of the annexation upon those who live in or own property in the proposed annexation area, (10) impact of the annexation upon the voting strength of protected minority groups, (11) whether the property owners and other inhabitants of the areas sought to be annexed have in the past, and in the foreseeable future unless annexed will, because of their reasonable proximity to the corporate limits of the municipality, enjoy economic and social benefits of the municipality without paying their fair share of taxes, and (12) any other factors that may suggest reasonableness. **See** *Matter of Boundaries of City of Jackson,* 551 So.2d 861, 864 (Miss. 1989).

These twelve factors are not separate, independent tests which are conclusive as to reasonableness. *Western Line Consol. School Dist. v. City of Greenville,* 465 So.2d 1057, 1059 (Miss. 1985). Rather, these factors are "mere indicia of reasonableness." "[T]he ultimate determination must be whether the annexation is reasonable under the totality of the circumstances." [citations omitted]. An annexation is reasonable only if it is fair. *Western Line,* 465 So.2d at 1060. In making this determination, the annexation must be viewed "from the perspective of both the city and the landowner[s]" of the proposed annexation area. *Id.* at 1059-60.

. . . .

[I]f the chancellor employed the correct legal standards, this Court's standard of review is limited. Reversal of the chancellor's findings regarding reasonableness of the annexation is warranted only if the chancellor is manifestly wrong and his findings are not supported by substantial credible evidence. *Matter of Confirmation of Alteration of Boundaries of City of Horn Lake, Miss. and the City of Southaven,* Miss. 630 So.2d 10, 16 (Miss. 1993) (citing *Matter of Enlargement of Corp. Limits of Hattiesburg,* 588 So.2d at 819.

*City of Jackson v. City of Madison,* 650 So.2d at 494-95. **See also,** *In the Matter of the Extension of the Boundaries of the City of Ridgeland, Mississippi: City of Jackson, Mississippi v. City of Ridgeland,* 651 So.2d 548 (Miss. 1995).

<u>DISCUSSION OF THE ISSUES</u>

**I. WHETHER THE LOWER COURT'S DETERMINATION THAT THE PROPOSED ANNEXATION IS "REASONABLE" PURSUANT TO MISS. CODE ANN. § 21-1-33 (1972) WAS MANIFESTLY WRONG AND UNSUPPORTED BY SUBSTANTIAL OR CREDIBLE EVIDENCE.**

¶6. The Objectors argue that when evaluating the twelve factors there is a lack of substantial credible evidence to support the chancellor's finding that the proposed annexation is reasonable. The City of Jackson, of course, argues that there is more than substantial evidence in the record to support such a

finding. The chancellor in her opinion and supplemental opinion discussed the evidence presented at trial concerning each of the twelve indicia of reasonableness set out by this Court in prior case law. The chancellor then concluded that Jackson's annexation of the entire proposed area was reasonable.

¶7. We disagree with the chancellor's findings but, deeming it unnecessary to do so, will not address the indicia separately as our explanation otherwise is adequate.

¶8. There was considerable undisputed evidence presented at trial that the population of the City of Jackson is decreasing and, that although there is considerable vacant, developable land within the City, applications for both residential and commercial building permits have decreased considerably over the last few years. While it is true that this Court has allowed annexations even though there is no significant population growth and/or a relatively high percentage of undeveloped land within the existing city limits, this presence of these factors should, at the very least, be an impediment to annexation. **See,** *Matter of Enlargement of Corp. Limits of Hattiesburg,* 588 So.2d 814. 819-21 (Miss. 1991); *City of Greenville v. Farmer's Inc.,* 513 So.2d 932, 934 (Miss. 1987); *Extension of Boundaries of Horn Lake v. Renfro,* 365 So.2d 633, 625 (Miss. 1979).

¶9. Evidence shows 40.15 square miles of vacant land within the City in 1990. The City's population has declined from 202,888 in 1983 to 196,637 in 1990 with an out-migration from Jackson of 26,532 people. Mayor Ditto admitted at trial that Jackson had no need to expand to accommodate "anticipated growth within its boundaries." The City admits in its brief that it is not trying to annex Byram because it has outgrown its existing boundaries, but argues that there are other factors that indicate its need to expand.

¶10. Michael Bridge, the Objectors' expert in urban and regional development, testified that, "the vacant land resources of the city are the most dominant resources of the land resources within the city. It comprises some 25,700 vacant acres, or 37 percent of the total land area within the existing city." Bridge testified, as follows, concerning the effect of a large amount of vacant and developable land within a city:

> When you have vacant developable land that's not put into productive urban use, then it essentially tends to be a drain on the economy and the fiscal structure of the city. Vacant land-- normally to go from developed area to vacant land to another developed area, you have to have roads. The utilities have to extend through that vacant area. So the city is in a position where they have expended in may instances significant resources to extend infrastructure into vacant areas and through vacant areas, and if the area does not develop or is not encouraged to develop, then it becomes a drain on the city because they have to extend those lines further and further. Those are not in productive uses. When those vacant lands go into productive uses, then they tend to strengthen the tax base. The converse, when you continually stretch the rubber band, you know, ultimately it will break. The concept of strengthening the tax base by ignoring the vacant land resources within the existing city is on the simplest basis just totally wrong.
>
> . . . .
>
> Because the city has to extend its full range of services throughout that area, so when it sends out a garbage truck, it has to travel more miles of streets to pick up the garbage. The same applies to the fire protection, the police protection. You have to extend and maintain utility

lines through those areas to interconnect the developed areas. The total cost to municipal governments substantially greater than a more compact form of development.

¶11. Bridge went on to testify concerning what is known as "leap frog development", that is, "the interdispersement of large vacant tracts of land between developed portions of land," within the City of Jackson:

There are examples of leap frog development not only within the existing city, but in the area south of the city. I might say this, that the City of Jackson inherited essentially that land use pattern that exists there. That is not something that they created. That was the development pattern that existed within the county. But before the city creates even a greater problem relative to leap frog development, it should encourage the Capitol City Commission's Report, you'll see that that was one of their primary concerns, that the city had to develop a program for in-fill development to alleviate the problems associated with leap frog development.

¶12. According to Bridge, the proposed annexation would aggravate the problem of leap frog development within the City. Bridge stated that in order to alleviate the problem, the City of Jackson must make "some type of investment within the existing community to encourage that type of development."

¶13. Bridge went on to discuss the concept of urban sprawl and its effect on the City of Jackson:

Urban sprawl is essentially the development of properties at an extremely low density. The properties are not necessarily characterized by excessively large, vacant parcels interdispersed between the development, but that the development tends to have some continuity but such a low density that it becomes extremely costly for the city to provide the municipal level services and facilities to that area.

. . . .

Most cities try to eliminate sprawl. There have been many planning articles and books written on the cost of urban sprawl. Urban sprawl is an extremely expensive manner for a city to service the area. . . . What cities attempt to do is to encourage a more intensive form of development, and they can do that through the proper application of their zoning ordinance and utility extensions.

According to Bridge, annexation would increase the City of Jackson's problems with urban sprawl.

¶14. The City at trial and in its brief has not been at all hesitant to state that it wants the revenues annexation would provide by expanding its tax base. Numerous witnesses testified at trial that the City was in need of expanding its tax base in order to continue providing the same level of services. Although it has been held that a city's need to maintain or expand its tax base, especially as growth and development occurs on its perimeters, is a factor to be considered when determining the reasonableness of a proposed annexation, *City of Jackson,* 551 So.2d at 865, this Court has in the past, been very critical of annexations which are in effect "tax grabs."

¶15. Over ninety years ago this Court held that "[m]unicipalities are not designed for the purpose solely, nor chiefly, of raising revenue. The power of extending corporate limits is granted not to be

resorted to for the purpose alone of increasing the income of the municipality. . . ." *Forbes v. City of Meridian,* 36 Miss. 243, 38 So. 676, 678 (1905). Much more recently, Justice Smith in his dissenting opinion in *In the Matter of the Enlargement of the City of Gulfport,* 627 So.2d 292, 296 (Miss. 1993), stated, "[c]ities should be required to demonstrate other valid reasons for annexation other than mere tax base increases."

¶16. From studying the record and briefs, especially the testimony of city officials, we believe that the City of Jackson's primary motivation for the proposed annexation is to expand its tax base. Whether or not the taxes garnered by annexing Byram would be beneficial to the City of Jackson when compared to the expenditures that would result from the annexation is debatable. Bridge testified for the Objectors that it would not.

> It's much easier to improve your tax base when you have developable properties within the city and the infrastructure in place or the ability to readily extend that infrastructure than it is to develop new infrastructure extending into undeveloped lands.
>
> . . . .
>
> Where you find the most intense development occurring in the City of Jackson is where someone else has paid for and developed the infrastructure. The City of Jackson probably has a real need to do some investing within their community to enhance the development of their properties within the city. It would be cheaper to do that than to go outside of the existing borders of the city and continually stretch that rubber band by extending, extending, extending infrastructure and services and facilities.
>
> . . . .
>
> I think the City of Jackson is going to see some potential tax benefits in the first few years, but as the need for services--as the citizens start knocking on the door expecting the promises as set forth in the annexation ordinance to be fulfilled, you're going to see an increasing burden placed upon the city.
>
> . . . .
>
> Until the city starts an in-fill process, I don't think we're going to see a dramatic turnaround. I think the city's going to have problems.

¶17. We tend to agree with Mr. Bridge's assessment. Before the City of Jackson annexes more land and residents for which it has had to extend infrastructure and provide services, it should make an effort to extend that infrastructure to the vacant, developable land within the existing boundaries and take steps to encourage development in those areas.

¶18. The City of Jackson maintains that if the city experiences a decline it will have an adverse affect on the entire metropolitan area, including the proposed annexation area. *City of Jackson, supra*. It is a fact that Jackson is the capital of the state and its largest city, and for these and other reasons the City's prosperity affects more than just the city itself. These things are validly taken into consideration; however, it is not a "super-factor" whereby whatever Jackson wants, Jackson gets. **See,** *Boundaries of City of Ridgeland,* 651 So.2d at 562; *City of Jackson v. City of Madison,* 650

So.2d at 507; *City of Jackson,* 551 So.2d 861. We believe the chancellor placed too much importance on this so-called "Jackson factor."

¶19. The City failed to prove that the current services in the proposed annexation area are inadequate. *Matter of Enlargement of Corp. Limits of City of Hattiesburg,* 588 So.2d 814, 824 (Miss. 1991). The City of Jackson produced no Byram resident, other than Ted Somers, Jackson's Public Works Director, who was not satisfied with the current level of services currently provided in the proposed annexation area. Instead, all residents who testified expressed concern about a decrease in the level of services, especially police protection, if annexation occurred. Furthermore, it should be noted that the proposal for improvements and extension of services presented to the Court by the City was merely the product of department head and planner recommendations, and the City Council had not approved any of the improvements the witnesses for the City testified that the City intended to make in the proposed annexation area. Michael Bridge testified that normally such plans are presented to the governing authorities for approval prior to being presented to the court.

¶20. Byram resident Julie Bronson, along with many others, testified she was very satisfied with the Hinds County Sheriff's Department and Byram Volunteer Fire Department. She stated that the Sheriff's Department was very visible in the area. Even Ted Somers, Jackson's Public Works Director, testified that Hinds County's road maintenance was at least as good as Jackson's. In fact Jackson's own written assessment stated that almost all the streets in the proposed annexation area were in good condition. The same cannot be said about the City's streets.

¶21. Bridge testified "that the utilities that are servicing the Byram area are adequate to meet the needs in that area." He went on to state that the "equipment that exists in the Volunteer Fire Department, including that which has been ordered, would exceed the equipment as promised in the annexation ordinance by the City of Jackson." Bridge testified that "this is the only instance in all the annexation cases I've ever been involved in where I've seen that the county level of service in terms of street maintenance and right-of-way maintenance has been noticeably better than the city."

¶22. The City states in its brief that the "undisputed testimony by Jackson was that Jackson is in good financial shape at present but needs to expand its tax base because real property values are declining and the overall tax base is stagnant." The Objectors concede that "theoretically Jackson has the financial ability to make the expenditures it proposes." However, they argue that the City's desire or will to make promised improvements should be considered in light of the City's past performance of failing to furnish the promised improvements to the 1976 and 1989 annexed areas.

¶23. The Objectors produced a number of Jackson residents, mostly from the 1976 annexation area, who testified unfavorably about the level of services provided by the City. Their main complaints dealt with the City's police and fire protection, road maintenance and sewer service. There was testimony concerning slow response time of the Jackson Police Department and their failure to sufficiently investigate crimes. There was also testimony concerning the lack of fire hydrants and insufficient water flow to adequately fight fires in South Jackson.

¶24. The only municipal service that the chancellor held that the proposed annexation area was in need of was sewer service. As to all other municipal services, she found only that they would be enhanced by annexation. When current services are adequate, the fact that annexation may enhance municipal services should not be given much relevance, **see** *City of Columbus,* 644 So.2d at 1178,

especially as here, where the evidence of the likelihood of enhanced service is greatly conflicting.

¶25. Many residents of Jackson's previous annexed areas testified about the City's failure to provide some of the promised services and improvements to the annexed areas and its substantial delay in providing others. Marcia Weaver, a member of the Jackson City Council for Ward 4, which includes a large portion of the 1976 annexation area, was one of the two City Council members to vote against annexation. Weaver testified that she received numerous calls, some as recent as a week prior to trial, concerning inadequate water lines to support fire hydrants. Weaver was still receiving calls from residents angry about the inadequate municipal services. Weaver stated that it was her belief that the City had not met the needs of its current residents and further annexation would cause a greater hardship. She testified that the City's performance in the 1976 area had been slow and the promises made had not been kept. She stated that in her opinion, "[b]ased on the past performance I just have to say that it [annexation] is not in the city's best interest nor the residents' best interest to move toward annexation until we can really begin to service those that we annexed years ago." On cross-examination, Weaver testified that the City did have a need for enhanced revenues, but she believed there were other options besides annexation.

¶26. Louis Armstrong, Jackson City Council member from Ward 2, which includes the 1989 annexation area, testified that many of the promises made by the City prior to the 1989 annexation had not been met. Although the five year period for implementation had not expired by the time of trial, Armstrong testified that he was concerned that the City was "not meeting its obligation to serve those residents." Regarding the proposal set forth by the City for the 1989 annexation area, Armstrong testified that no water or sewer service had been extended to the Madison County area, the City had abandoned its plan to build a new fire station, negotiations for the purchase of the Livingston Road Water Association or the Ridgeland franchise did not commence in 1990 as promised, water improvements scheduled for fiscal years 1991 and 1992 had not been made, and fire ant, and rat control had not been provided as promised.

¶27. Bridge, testifying about the 1976 area, stated that there was widespread open dumping and inadequate sewer and water service. He stated that the conditions in the area "are not conducive to encouraging residential development or commercial development or industrial development." Bridge, who was involved in the 1989 annexation, testified that the only drainage work done in the area, other than backhoe work, was the placement of two, 15-foot drainage pipes, approximately 2 feet in diameter placed on a road that leads to two houses.

¶28. The testimony concerning the City's past performance in previously annexed areas compel us to restate that this Court feels that the City of Jackson should make an effort to extend the infrastructure and enhance services and facilities within its existing boundaries in order to encourage development and expand its tax base.

¶29. Of major concern to this Court is the effect on the existing school district boundaries if the annexation were to be affirmed. It is the desire of the residents of the proposed annexation area that their children remain a part of the Hinds County School District. At the time of trial, the law concerning whether or not an annexed area would automatically be incorporated into the school district of the annexing municipality was in a state of flux and the chancellor dealt with this issue as the law stood at the time of trial. That is, that the boundaries of the school districts would not

automatically change. There have been some major developments in this area since the final judgment in this case was rendered. Because of the uncertainty resulting from the unsettled state of the law in that area, the Hinds County School District ("HCSD") was given leave to file as an *Amicus Curiae* in this case.

¶30. The Mississippi legislature in 1986 adopted the Uniform School Law of 1986, Laws 1986, ch. 492 § 1, *et. seq.* which *inter alia* repealed Miss. Code Ann. § 37-7-611 (1972), the provision which automatically expanded municipal school boundaries each time a city annexed additional territory. Section 52 of the Act amended § 37-7-103 *et seq.* to provide that upon annexation a municipal school district's boundaries would expand only with the consent of the school board governing the annexed area.

¶31. Subsequently, questions were raised, both in this Court and in the federal courts, as to whether § 47 of the Uniform School Law, which repealed § 37-7-611, was precleared by the United States Attorney General under § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. **See *Greenville Public School District v. Western Line Consolidated School District,*** 575 So.2d 956, 958 (Miss. 1990), ***In Re City of Booneville,*** 551 So.2d 890, 983-95 (Miss. 1989). In ***Greenville Public School Dist.***, this Court held the Attorney General had in fact precleared the entire Uniform School Law, and that Miss. Code Ann. § 37-7-611 was implicitly repealed by Section 52. 575 So.2d at 963-4. The United States Supreme Court denied *certiorari* in ***Greenville Public School District v. Western Line Consolidated School District,*** ___U.S.___, 112 S.Ct. 1512, 117 L.Ed.2d 649 (1992).

¶32. The United States District Court for the Southern District of Mississippi in ***Dupree v. Mabus,*** 776 F.Supp. 290 (S.D. Miss. 1991), also held that the entire Uniform School law had been precleared. However, on the same day it denied *cert.* in ***Western Line,*** the United States Supreme Court vacated and remanded ***Dupree v. Mabus*** to be considered in light of its holding in ***Clark v. Roemer,*** 500 U.S. 646 (1991). ***Dupree v. Moore,*** ___U.S. ___, 112 S.Ct. 1462, 117 L.Ed.2d 609 (1992) (***Dupree I***). Upon remand the District Court reversed its earlier ruling and found that Mississippi "did not satisfy requirement that it identify with specificity change in law to be precleared" and therefore repeal of § 37-7-611 had not been precleared by the Attorney General. ***Dupree II,*** 831 F.Supp. 1310 (S.D. Miss. 1993). This ruling was made some two months after final judgment in the case *sub judice.* Furthermore, on October 17, 1994 the U.S. Supreme Court invited the Solicitor General to "file a brief addressing the effect of this Court's holding in ***Western Line*** that Miss. Code Ann. § 37-7-103 (1972 & Supp. 1990) supersedes Miss. Code Ann. § 37-7-611 (1972) and repeals it by implication. ***Moore v. Dupree,*** ___U.S.___, 115 S.Ct. 353, 130 L.Ed.2d 308 (1994).

¶33. On April 17, 1995, the U.S. Supreme Court in ***Moore v. Dupree,*** ___U.S.___, 115 S.Ct. 1684, 131 L.Ed.2d 550, vacated and remanded ***Dupree II*** to the District court "to clarify whether it has enjoined only Section 47 of the Uniform School Law, 1986 Miss.Gen.Laws ch. 492, or whether it has also enjoined the effect of Section 52 insofar as Section 52 implicitly repealed Miss. Code Ann. Section 37-7-611 (1972).

¶34. On remand, the United States District Court for the Southern District of Mississippi, in ***Dupree v. Moore,*** Civil Action No. H90-0043(W) ("***Dupree III***"), held that Section 52 as well as Section 47 was enjoined, stating:

> when Section 52 was submitted for preclearance by the Attorney General, the State of

Mississippi did not discuss the repealed matter of automatic expansion. Instead, the State of Mississippi merely explained the consent factor relative to alterations of school district boundaries. Our Order concluded that even if Section 52 repealed § 37-7-611, that fact was not submitted to the Attorney General for preclearance. Thus, we are of the opinion that Section 52 was not submitted with the specificity required by *Clark v. Roemer*.

*Dupree III*, slip op. at 4. (footnote omitted).

¶35. The Southern District Court, citing *Nickles, et al. v. Western Line School District, et al.,* Civil Action No. 4:90-cv-45BO, where the United States District Court for the Northern District of Mississippi, the Honorable Neal B. Biggers, Jr., presiding, decided on October 30, 1995, that this Court's decision in *Western Line* was not binding on it. *Dupree III*, slip op. at 5. The Court stated:

> *Clark v. Roemer* was decided after the Mississippi Supreme Court's decision in *Western Line* and after this three-judge court's decision in *Dupree v. Mabus*, 776 F.Supp. 290 (S.D. Miss. 1991). Thus, any binding effect the Mississippi Supreme Court's decision in *Western Line* may have had was superseded by the United States Supreme Court's decision in *Clark v. Roemer*.

*Dupree III*, slip op at 6. The District Court's decision in *Dupree III* was affirmed by the United States Supreme Court on June 10, 1996. **See** *Moore v. Dupree,* 64 USLW 3815, 1996 WL 183420.

¶36. The District Court's decision to enjoin Section 52 as well as Section 47 of the Mississippi Uniform School Law was subsequently stayed by order issued by the United States District Court for the Southern District on July 30, 1996. The stay was granted in order to allow the State time to seek a declaratory judgment from the District Court for the District of Columbia under 42 U.S.C. § 1973 c. Further, the Southern District Court sought to avoid the disruption that would occur if its rulings were implemented and later the District Court for the District of Columbia ruled in favor of the State. The Supreme Court affirmed the stay issued by the Southern District Court. *Dupree v. Moore*, No. 96-669, 1997 WL 63807 (S.D. Miss. Feb. 18, 1997). This will allow the State of Mississippi the opportunity to seek a declaratory judgment in the District Court for the District of Columbia. The uncertainty regarding the implementation of §§ 47 and 52 of the Mississippi Uniform School Law affects the reasonableness of the proposed Jackson annexation at this time.

¶37. The Objectors at trial and in their brief argued that the chancellor should have considered whether or not the Jackson Public School District ("JPSD") could successfully accommodate the students in the proposed annexation area. The chancellor in response to a motion by the HCSD determined that the court would determine reasonableness "based on current law as it exists in Mississippi today" which was that annexation would not effect the status quo of the school districts involved. The subsequent developments discussed above indicate the possibility that § 37-7-611 may not have been successfully repealed and is still governing law.

¶38. There are over 1200 students that would be affected by the annexation. The evidence presented at trial shows that JPSD is reluctant to except the students from the proposed annexation area and has no proposed plan in place if the school districts' boundaries were to change. Dr. Benjamin Cannada, then JPSD Superintendent, testified that JPSD was "not seeking any new students to come into the system." Cannada testified that he thought JPSD could accommodate the additional students but admitted that with the exception of possibly two schools, all of JPSD's schools were already

operating at or above capacity and that no thought had been given to where the annexed students would attend school. Dr. Cannada also testified that the funding of a building program that the schools had received from a recent bond issue was based on current enrollment and growth and the possibility of annexation had not been taken into account.

¶39. Dr. Leslie Johnson, HCSD Superintendent, testified that if the proposed annexation area was to be incorporated in to the JPSD it would be a "very devastating situation for " the HCSD. He stated that HCSD would lose approximately 25% of its student population and about 50% of its students in that area of the county.

¶40. The effect of annexation on the school districts involved is a serious consideration which should be addressed. Although the chancellor had case law to support her decision that the school districts would not be affected at this time, the law is not clear as to how the school districts in an annexed area will be treated. To allow the annexation to proceed prior to a decision by the District Court for the District of Columbia would be most unreasonable, as it would go completely against the stay of injunction issued by the District Court of the Southern District of Mississippi which was recently affirmed by the Supreme Court.

¶41. The City also maintains that if the annexation is denied then there will most likely be a renewed effort to incorporate the proposed annexation area, which if successful will effectively cut off one of the City's two remaining paths of growth. The fact that none of the named defendants in this case appeared at trial to contest the annexation does not necessarily weigh in favor of the reasonableness of the proposed annexation. In fact it could be considered as a factor indicating unreasonableness since one of the City's last potential paths of growth is not being threatened by annexation from other municipalities. Furthermore, this Court is not encouraging the incorporation of the Byram area, nor are we saying that Jackson's annexation of this area would not be reasonable at a later time. We merely find that the record does not support annexation at this time.

### II. WHETHER THE LOWER COURT ERRED IN FAILING TO CONSIDER THE TOTALITY OF THE CIRCUMSTANCES.

¶42. The objectors argue that the chancellor failed to consider the totality of the circumstances, as required, when considering the evidence and making her decision. For the reasons hereinabove stated, we agree.

### III. WHETHER THE LEGAL STANDARD SHOULD BE MODIFIED FOR DETERMINING REASONABLENESS OF A PROPOSED ANNEXATION.

¶43. Lastly, the Objectors ask that this Court use the case *sub judice* as a vehicle to modify the test for determining reasonableness under § 21-1-33. As we find the proof before us sufficient for reversal in this case, we decline the invitation to make any changes at this time to the test of reasonableness in annexation cases.

## CONCLUSION

¶44. This is a case in which the annexing municipality has a declining population and decreasing development, and the City all but admits that it is simply making a "tax grab." Furthermore, Jackson

failed to produce a single resident or landowner of the proposed annexation area who favored annexation. The state of the law concerning the effect of annexations on school district boundaries was uncertain at the time of the chancellor's decision. Until a decision is reached by the District Court for the District of Columbia regarding the Uniform School Law, allowing the annexation to take place would run afoul of the most recent decisions of the District Court for the Southern District of Mississippi and the Supreme Court involving *Dupree*. All these and other factors have a significant bearing on the reasonableness of the proposed annexation, and we find that at this time the City of Jackson's proposed annexation is unfair to the residents of the proposed annexation area and fails to meet the test of reasonableness. The proof before this Court does not sustain the chancellor's decision and, accordingly, we reverse.

¶45. **REVERSED AND RENDERED.**

**LEE, C.J., SULLIVAN, P.J., McRAE, SMITH AND MILLS, JJ., CONCUR. PRATHER, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, J. PITTMAN, J., NOT PARTICIPATING.**

### PRATHER, PRESIDING JUSTICE, DISSENTING:

¶46. I respectfully dissent. In my view, the chancellor's ruling was supported by substantial evidence and should be affirmed. The record clearly indicates that the chancellor carefully considered the various factors relating to reasonableness, and her findings were clearly supported by evidence in the record. One particular concern I have is with regard to the City's need to expand its tax base. The objectors would have this Court place little if any importance on this issue, but, it is clearly essential that the City be able to gain revenue from those citizens who so often enjoy the benefits of its services. As to the City's needs in this regard, the chancellor found that:

> The City's evidence of need to expand was more than adequate. As the economic, governmental, and cultural center of Mississippi, Jackson's continued economic well being is important to the central portion of Mississippi and the entire state. One of the indicators of a declining tax base in Jackson is the fact that real property assessed valuation in Jackson has declined in the past three years, indicating a clear trend toward stagnant tax revenues. A substantial portion of Jackson's overall revenue comes from its real property tax revenues, making a decline of such revenue quite significant.

¶47. This Court has held that City of Jackson's need to maintain or expand its tax base, especially as growth and development occurs on its perimeters, is a factor to be considered under the "need to expand" factor. In *Matter of Extension of Boundaries of City of Jackson,* 551 So. 2d 861 (Miss. 1989), this Court wrote that:

> Jackson's need for an expanded tax base is reasonable as well. As a matter of fact, recent years reflect a gradual recession of Jackson's (economic) life blood to the various surrounding communities. These communities have experienced meteoric growth, most of them with a planned development. They have drained off and continue to drain off the life of the city's flow of wealth in people, culture and dollars. Indeed, the very statistics recited by the Court below are the product of the flight of so many persons from Jackson's corporate limits, not so far as to

deprive themselves of full access to the economic, social and cultural benefits Jackson has to offer but only so far as to sever their relationship with Jackson's assessor and tax collector. Barring a wholly unanticipated act of altruism by Ridgeland, Madison, Flowood, Pearl, Richland, Florence or Clinton - not to mention unincorporated western Rankin County, Jackson faces the certainty of a slow but sure erosion of its tax base by the unilateral actions of these selfish former citizens.

*City of Jackson*, 551 So.2d at 865. The words of this Court in *City of Jackson* are equally applicable today. I find it ironic that representatives of areas which have grown largely out of a desire to avoid taxation for the services which they enjoy in City of Jackson should accuse the City of attempting a "tax grab" out of considerations of greed.

¶48. In the case of City of Jackson, the need for tax dollars is more a matter of survival than greed. As the home of many government buildings, City of Jackson is faced with the burden of having much of its real estate occupied by tax-exempt entities, and the City has recently seen a flight of important tax-paying businesses to surrounding areas. This Court has given some, but, in my view, insufficient, consideration to City of Jackson's need for physical expansion outside of its current boundaries, but the welfare of our capital city depends upon more than available land. Tax-paying citizens are indeed the lifeblood of a modern city, and allowing City of Jackson the physical area it needs to expand while depriving it of the economic lifeblood it needs to survive would be tantamount to allowing the City to wither on the vine.

¶49. This majority decision presents a challenge to the leadership of the metro communities of the greater Jackson area to develop inter-governmental co-operative activities that improve the infrastructure of the entire area and advance the general welfare of the cooperating people. By appropriate action of their joint governing bodies, the municipalities of the metro area should seek to exercise powers common to them, or seek statutory legislation for such action, to enhance services, facilities, or other projects. Co-operative intergovernmental relationships of all of the metro municipalities engender the improvement of the quality of service for the entire area as most of the workforce comes into City of Jackson to earn their livelihood.

¶50. Although revenue considerations constitute one of City of Jackson's most pressing problems at this time, the fact remains that the majority's opinion will also serve to place in jeopardy one of City of Jackson's two remaining paths of growth. The chancellor noted that City of Jackson's ability to expand towards the east, north, northeast, and west have been cut off by surrounding communities, and the majority's opinion places the area to the south/south-west in increasing danger of being cut off as well. It is clear that Byram lies in one of City of Jackson's few remaining potential paths of growth, and this Court noted in *City of Jackson* that it need only be shown that the area to be annexed is, "in a path of growth, not necessarily the most urgent or even the city's primary path of growth." *City of Jackson*, 551 So.2d at 865.

¶51. Although City of Jackson has not been experiencing growth in the last few years, the potential for growth nevertheless remains. That potential for growth will be seriously and adversely affected, however, if this Court allows the gradual encirclement of our capital city to continue. This Court wrote in *City of Jackson* that:

This is not an ordinary annexation case. Much more is at stake than whether a large

municipality may annex 4.92 square miles along its northern border. Rather, we must decide whether Mississippi's largest and capital city, already largely landlocked by a plethora of bedroom communities, will have another nail driven in the coffin which, if closed, will doom it to the fate already experienced by so may central cities around the nation. It is patently unreasonable that this should occur.

*City of Jackson,* 551 So.2d at 862. I find unpersuasive the objectors' argument that the City has no need to expand based on the fact that it is not experiencing a population growth. In previous cases, this Court has allowed annexations in cases in which there was no significant population growth and/or a relatively high percentage of undeveloped land within the existing city limits. See *Matter of Enlargement of Corp. Limits of City of Hattiesburg,* 588 So.2d 814, 819-21 (Miss. 1991); *City of Greenville v. Farmer's, Inc.,* 513 So.2d 932, 934 (Miss. 1987); *Extension of Boundaries of Horn Lake v. Renfro,* 365 So.2d 623, 625 (Miss. 1979).

¶52. This Court should not permit the annexation without a showing that the citizens in the annexation area would receive value for their tax dollars. *Extension of Boundaries Columbus*, 644 So.2d 1168 (Miss. 1994). In this regard, the chancellor found that the increased taxes that would be imposed on residents in the annexation area would be offset by increased services and a reduction in fire insurance premiums and water rates. As both parties agree, the City of Jackson has the financial ability to make improvements and furnish necessary services. Although the City's past performance in its previous annexed areas has at times been less than exemplary, the evidence does show that City of Jackson has provided numerous services and improvements in annexed areas.

¶53. A continuation in City of Jackson's decline will have an adverse effect on the entire metropolitan area, including the proposed annexation area. If the annexation is denied, there will most likely be a renewed effort to incorporate the proposed annexation area which, if successful, would effectively cut off one of the City of Jackson's two remaining paths of growth. In my view, the chancellor properly gave serious consideration to the needs of our capital city in concluding the annexation to be reasonable, and I would affirm her ruling. Accordingly, I dissent.

**BANKS, J., JOINS THIS OPINION.**

1. The proposed annexation area makes up a significant portion of the unincorporated community known as Byram. For the purposes of this opinion, the terms "Byram" and "proposed annexation area" will be used interchangeably.