# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-AN-02139-SCT

*IN THE MATTER OF THE EXTENSION OF THE BOUNDARIES OF THE CITY OF PEARL, MISSISSIPPI: CAROL POOLE, ROBERT PITTS, ET AL.*

*v.*

*CITY OF PEARL, MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/27/2002 |
| TRIAL JUDGE: | HON. JAMES LAMAR ROBERTS, JR. |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | JAMES H. HERRING |
| ATTORNEYS FOR APPELLEE: | JERRY L. MILLS |
| | JAMES A. BOBO |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | AFFIRMED - 08/11/2005 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1. Today, we review yet another vigorously contested annexation effort by one of our municipalities. Perhaps no area of the law generates more emotional participation by members of the public. The idea of having one's home, property and family forced into a city, subjecting the land to city taxes and the family to city ordinances, is quite distasteful to many, particularly those who feel they have no say in the matter under our current law.

¶2.     In this case, both Rankin County chancellors recused.  The Honorable James L. Roberts, Jr., was appointed as a special chancellor to hear the case.  Finding the requirements of law had been met, Special Chancellor Roberts approved the annexation.  The Objectors have appealed.

## INTRODUCTION

¶3.     In the case before us, counsel for the City of Pearl reminds us that the chancery court, following this Court's precedent, found the annexation to be reasonable.  Counsel for some of the Objectors urges this Court to "change the course" of annexation by adding the requirement of an affirmative vote by a majority of the citizens living in the proposed annexation area.  This, according to the Objectors, would more closely level the playing field where cities spend large sums of taxpayer dollars to hire lawyers and experts to establish the "reasonableness" of a proposed annexation, while objectors are frequently relegated to bake sales and car washes to raise funds to battle annexation.

¶4.     Annexation is an exercise of legislative not judicial power.[1]  This Court stated almost eighty years ago:

> Municipal corporations are now, as they have always been in this state, purely creatures of legislative will; governed, and the extent of their powers limited, by express grants; invested, for purposes of public convenience, with certain expressed delegations of governmental power; their granted powers subject at all times to be enlarged or diminished; . . . their powers, their rights, their corporate existence, dependent entirely upon legislative discretion, . . . Unless expressly limited by constitutional provision, the legislative department has absolute power over municipalities.

*Gully v. Williams Bros., Inc*., 182 Miss. 119, 180 So. 400, 405-06 (Miss. 1938).

---

[1] *Matter of the Boundaries of City of Jackson*, 551 So.2d 861, 863 (Miss. 1989) ("Annexation is a legislative affair.")

2

¶5. There is no uniform method of annexation recognized in the various states. In some states, direct legislative action is required to enlarge or reduce a municipality's boundary lines. In other states, the legislature statutorily mandates certain conditions for annexation, leaving the final decision to the local governing boards. In many of these circumstances, the process of annexation is begun by a "petition of voters, taxable inhabitants, residents, or the like, and to be submitted to a vote of designated electors." 2 McQuillin Mun. Corp. § 7.14 (3rd ed.). Still another method of annexation allows for a petition to the courts to instigate annexation. Ultimately, granting to municipalities the substantive right to annex unincorporated areas is a power reserved exclusively to the state legislatures.

*Annexation in Mississippi*

¶6. Since 1892, the Mississippi Legislature has provided that our courts must determine the reasonableness of a municipality's desire to expand or reduce its boundaries. 1892 Miss. Laws ch. 66, § 3. Annexation statutes in Mississippi have been fairly consistent since 1892. Our current statute, adopted on April 18, 1950, provides that a chancellor, rather than a jury, must determine that "reasonable public and municipal services will be rendered in the annexed territory within a reasonable time," and that the proposed annexation is "reasonable and is required by the public convenience and necessity." Miss. Code Ann. § 21-1-33.

¶7. The chancery courts (hearing annexation cases) and this Court (reviewing the appeals of many of those cases) encounter the recurring thunderous objection of many living in a proposed annexation area who believe they should be allowed to vote before being taken into a city. A frequent argument presented is that persons who purchased property out in the county to escape "city living" should not have their decision rendered null and void without a vote.

¶8. Every year since 1997, approximately twelve bills or resolutions have been proposed in the Legislature on the subject of annexation. In the 2005 regular session of the Mississippi Legislature, eleven separate bills, including a proposed constitutional amendment, were introduced to radically change annexation procedures. *See* House Bills 187, 216, 292, 483, 643, 761, 783, 796, 1169; House Concurrent Resolution 32; and Senate Bill 2889. Most of the bills sought to abolish the current method of annexation (having a chancellor approve an annexation's reasonableness) and replace it with an election to determine the reasonableness of an annexation. Several bills required an approval vote in the territory the municipality sought to annex. Some of the bills required a simple majority vote of the qualified electors residing in the proposed annexation area. One bill required a majority vote in both the city and the proposed annexation area, while still another bill required approval of 60% of the qualified electors residing in the proposed annexation area. One member of the House of Representatives proposed a constitutional amendment which would have required a majority vote in a special election. All eleven bills died in committee, leaving intact and unchanged the statute enacted in 1950.

¶9. Thus, accepting as we must the Legislature's exclusive authority to make and change the law; and accepting as we must our limitation to interpret and apply the laws passed by the Legislature, we now proceed to decide this case, not unmindful of the substantial public dissent to our current law; but ever mindful that such dissent is more properly communicated to members of the Legislature than to the chancellors and Justices on this Court.

## BACKGROUND FACTS AND PROCEEDINGS

¶10. On July 19, 2000, the City of Pearl filed its petition in the Rankin County Chancery Court, seeking to annex approximately 2.2 square miles. The proposed annexation area ("PAA") is bounded on the west by Jackson Municipal Airport, on the east by the City of Brandon, on the north by City of Flowood, and on the south by the City of Pearl. Because the PAA included property within the jurisdiction of the Jackson Municipal Airport Authority ("Airport Authority"), an objection was filed by both the Airport Authority and the City of Jackson. This objection culminated in a joint motion for summary judgment, seeking exclusion from the annexation approximately 40 acres. The chancellor granted the motion and the Airport Authority and the City of Jackson ceased their efforts as Objectors. Objections to the annexation were also filed by two groups of private citizens, one known as the Poole Objectors and the other as the Pitts Objectors.

¶11. During the course of the twenty-five day trial which began on August 13, 2001, the special chancellor, counsel, and representatives of the parties toured the proposed annexation area and parts of the City of Pearl. At the conclusion of the trial, Special Chancellor Roberts found that, under the totality of the circumstances, the annexation was reasonable.

## STANDARD OF REVIEW

¶12. When a chancellor finds an annexation to be reasonable, this Court will reverse only when the "chancellor's decision is manifestly wrong and is not supported by substantial and

credible evidence." ***In re Extension of Boundaries of City of Winona***, 879 So.2d 966, 971

(Miss. 2004). Further,

> [w]here there is conflicting, credible evidence, we defer to the findings below. Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence. We may only reverse where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made. "The judicial function is limited to the question of whether the annexation is reasonable."

***Id. See also In re Enlargement and Extension of Municipal Boundaries of City of Biloxi***,

744 So.2d 270, 277 (Miss. 1999); ***McElhaney v. City of Horn Lake***, 501 So.2d 401, 403

(Miss. 1987); ***Extension of Boundaries of City of Moss Point v. Sherman***, 492 So.2d 289,

290 (Miss. 1986); ***Enlargement of Boundaries of Yazoo City v. City of Yazoo City***, 452

So.2d 837, 838 (Miss. 1984); ***Extension of Boundaries of City of Clinton***, 450 So.2d 85, 89

(Miss. 1984).

## ANALYSIS

¶13. Although the constitutional portion of the statute which controls annexation litigation

requires only that the chancellor find the proposed annexation to be reasonable, this Court's

historical affection for tests, lists, and factors has led to the extra-statutory development of

twelve "indicia" of reasonableness, which are: (1) need for expansion, (2) path of growth, (3)

potential health hazards from sewage and waste disposal in the annexed areas, (4) financial

ability to make improvements and furnish services promised, (5) need for zoning and overall

planning, (6) need for municipal services, (7) presence of natural barriers between municipality

and proposed annexation area, (8) past performance, (9) impact on residents and property

6

owners, (10) impact on the voting strength of protected minority groups, (11) benefits enjoyed by the PAA because of its proximity to the municipality without paying its share of the taxes, and (12) other factors.  *In re Extension of Boundaries of City of Winona*, 879 So.2d  at 972-73.

¶14.    Although some fall into the trap of strict adherence to the indicia as though they were twelve conditions precedent to an annexation, this Court has held otherwise.  The twelve indicia of reasonableness are not to be treated as twelve distinct tests, rather, the chancellor must weigh the totality of the circumstances, using these twelve indicia of reasonableness only as a guide.  *Id.* at 993 (Dickinson, J., dissenting) *citing **Matter of Enlargement of Municipal Boundaries of the City of Jackson***, 691 So. 2d 978, 980 (Miss. 1997).  *See also **Extension of Boundaries of City of Ridgeland v. City of Ridgeland***, 651 So.2d 548, 553 (Miss. 1995), wherein we stated, "This Court has frequently reiterated its position that the factors to be considered are not to be treated as separate, independent tests but rather indicia of reasonableness, and that the ultimate determination must be whether the annexation is reasonable under the totality of the circumstances."

¶15.    We turn now to the special chancellor's analysis of Pearl's proposed annexation to determine whether his finding of reasonableness was supported by substantial and credible evidence.

    1.  Need for Expansion

¶16.    In examining Pearl's claim of a need for expansion, the special chancellor stated:

> Clearly, spillover growth has occurred into the proposed annexation area, and it is not required that a city be built out prior to spillover.  While Pearl has considerable land available for development within its present borders, this

7

alone is not the test, and the proposed annexation area is needed on the north side which presently has little developable land available. The City of Pearl is growing, both residentially and commercially, as is the proposed annexation area residentially, and it is reasonable that this small area be added to Pearl, even though the tax base may be unneeded by Pearl. The present City and the proposed annexation area are surrounded on all sides by municipalities and/or state institutions and a sizeable flood plain. The combination of these municipalities, the flood plains, building activity, and the fact that an unzoned Rankin County permits uncontrolled growth, all combines to show a need for expansion in the present City.

¶17. Although refusing to establish a litmus test, this Court has in prior cases approved numerous factors to be considered by a chancellor in determining whether a municipality has a need for expansion. These factors include the city's spillover development into the proposed annexation area;[2] the city's population and internal growth;[3] the city's need for developable land,[4] and its remaining vacant land within the city;[5] the need for comprehensive planning for growth in the annexation area;[6] increased traffic counts;[7] the need to maintain and expand the

---

[2]*In re: Extension of Boundaries of City of Ridgeland, City of Jackson v. City of Ridgeland,* 651 So.2d 548, 554 (Miss. 1995).

[3]*Matter of Extension of Boundaries of City of Columbus,* 644 So.2d 1168,1174 (Miss. 1994); *In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So. 2d 270 (Miss. 1999); *In re: Extension of Boundaries of City of Ridgeland, City of Jackson v. City of Ridgeland*, 651 So.2d at 554.

[4]*Matter of Extension of Boundaries of City of Columbus,* 644 So.2d 1168, 1173 (Miss. 1994).

[5]*Extension of Boundaries of City of Ridgeland v. City of Ridgeland* 651 So.2d 548, 555 (Miss. 1995). *See also In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So. 2d 270 (Miss. 1999).

[6]*Extension of Boundaries of City of Ridgeland v. City of Ridgeland*, 651 So.2d 548, 553 (Miss. 1995).

[7]*In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So. 2d 270, 279 (Miss. 1999).

City's tax base;[8] limitations due to geography and surrounding cities;[9] environmental influences;[10] the city's need to exercise control over the proposed annexation area to provide comprehensive planning and growth;[11] and increased new building permit activity.[12]

*Spillover development into the PAA*

¶18.    According to the exhibits introduced by the City and other evidence presented at trial, the only meaningful access road through the PAA, which connects the City to the substantial growth and development along Lakeland Drive (Highway 25), is El Dorado Road.  During the past decade, substantial residential development has occurred along this corridor, including more than six hundred new residential units between U.S.  Highway 80 and Old Brandon Road. There has also been, to a lesser extent, some commercial development.  The City provided evidence of growth and development north along El Dorado Road, including over thirty instances of residential and commercial construction.

¶19.    Michael Slaughter, the City's expert in the fields of civil engineering and urban and regional planning, testified that spillover growth into the PAA from Pearl was taking place. While Pearl, with a population density of over 1,000 persons per acre, increased its population

---

[8]***Matter of Enlargement and Extension of the Mun. Boundaries of the City of Jackson***, 691 So.2d 978, 789 (Miss. 1997).

[9]***In re Enlargement and Extension of Municipal Boundaries of City of Biloxi***, 744 So. 2d 270, 279 (Miss. 1999).

[10]***Id.  Matter of Extension of Boundaries of City of Columbus***, 644 So.2d 1168, (Miss. 1994*)*; ***Matter of City of Horn Lake***,  630 So.2d 10, 17,  (Miss. 1993).

[11]***Extension of Boundaries of City of Ridgeland v. City of Ridgeland***, 651 So.2d 548, 553 (Miss. 1995).

[12] ***Id.***

by approximately 12% from 1990 to 2000, the PAA experienced a 33% increase in population during the same period and increased its population density from 283 persons per square mile in 1990, to 377 in 2000. Relying on a field study, Slaughter testified that both commercial and residential development was occurring in the PAA. Furthermore, Slaughter found the PAA "in dire need of proper planning and zoning."

¶20. Slaughter's testimony, together with the other evidence in the record, was considered by the special chancellor, and we cannot say he was manifestly wrong in his analysis of this factor.

### The City's population and internal growth

¶21. The City's population increased by over twelve % from 1990 to 2000, and during that same period, the number of dwelling units increased from 19,588 to 21,961. While not an overwhelming population explosion, the City's population is steadily increasing. This Court recently upheld an annexation by a city whose population growth "decreased by 7.6% from 1980 to 1990." *In re Extension of Boundaries of City of Winona*, 879 So.2d at 993 (Dickinson, J., dissenting). Thus, we are unable to say that the special chancellor was manifestly wrong to consider the City of Pearl's twelve % population increase as a factor supporting the reasonableness of the annexation.

### The City's need for developable land

¶22. The Objectors point out that the City of Pearl has approximately 5.7 square miles of vacant, developable land left after its 1999 annexation, suitable for residential development. Additionally, the Objectors point to Mayor Jimmy Foster's testimony that the Riverwind subdivision on Pearson Road, south of I-20, can accommodate substantial residential

10

development. The Objectors argue that the availability of land for residential development is particularly important in this case because Mayor Foster testified that the PAA would remain residential if the annexation is approved.

¶23. The City recognizes it has substantial land available for residential development. It points out, however, that most of it lies south of I-20 in the area it annexed in 1999 and south of a portion of the area it annexed in 1978. However, the special chancellor found "little developable land" to the north in the direction of the PAA.

¶24. Our previous annexation decisions clearly distinguish the impact upon reasonableness of available developable land in a city's path of growth as opposed to developable land in other areas. We have stated that "the fact that there may be some other vacant lands already available in the City does not prohibit annexation nor does it require that an indicia be fount to be against the community proposing annexation." *Id*. at 973. Similarly, in *In re Extension of Boundaries of City of Hattiesburg,* 840 So.2d 69 (Miss. 2003), the chancellor found the City of Hattiesburg had "large sections of undeveloped land in South Hattiesburg." Nevertheless, this Court refused to reverse the chancellor's finding that "Hattiesburg's need to expand was reasonable," based upon a need for developable land to the west, in the direction of the proposed annexation area. *Id*. at 84-85.

¶25. In arguing that Pearl has no need for expansion which would support its annexation effort, the Objectors focus on Pearl's slowly growing residential population, which increased approximately 12% from 1990 to 2000. However, the record reflects that the density of population in the City of Pearl is more than double every other municipality in Rankin County, except Brandon. Its density is four times that of neighboring Flowood.

11

¶26. At trial, Shelly Johnstone testified on behalf of the Objectors as an expert in the field of regional and municipal planning. Even her testimony suggests the special chancellor's finding of Pearl's need for expansion was reasonable and supported by the evidence. For example, she testified that at a level of about two-thirds build-out,[13] communities "need to be considering adding territory to their community." She further stated that Pearl's build-out was 74 percent, leaving just 26 percent of the current city available for development. Other testimony established that the PAA was only 57.2 percent developed.

¶27. Based upon the record, we cannot say it was manifest error for the special chancellor to find that Pearl has a need for expansion which supports Pearl's annexation of the PAA.

2. Path of Growth

¶28. In discussing whether the PAA lies within the path of growth of Pearl, the special chancellor found:

> The proposed annexation area does lie in the Pearl path of growth based upon recent building in Pearl, as well as within the proposed annexation area. Good roads exist and connect the two, and the proposed annexation area is Pearl's only northern path for growth. Quite importantly, Pearl is the only water provider to the proposed annexation area.

¶29. When determining the "path of growth" factor in prior cases, this Court has held that the inquiry is primarily whether the PAA is in a path of growth for the municipality, not necessarily the primary, main, or most urgent path. *See City of Winona*, 879 So.2d at 977; *Extension of the Boundaries of the City of Hattiesburg*, 840 So.2d at 86-87; *In re City of Horn Lake*, 630 So.2d 10, 19 (Miss. 1993). Although many factors can weigh on a

---

[13]Build-out is the term that expresses the percentage of the municipality that is developed or in development. In other words, it is the percentage of the city no longer available for development.

chancellor's evaluation of a municipality's path of growth, this Court has held that the most important factors are "the adjacency of the proposed annexation area to the City, accessibility of the proposed annexation area by City streets, and spillover of urban development into the proposed annexation area. *City of Winona,* 879 So.2d at 977, *citing* ***In re Enlargement and Extension of Boundaries of City of Macon,*** 854 So.2d 1029, 1037 (Miss. 2003).

¶30.    There is no dispute that the PAA is adjacent to the City of Pearl. Also, as previously discussed, El Dorado Road traverses the PAA and connects Pearl to the substantial development and amenities to the north along Lakeland Drive. This road begins in the City of Pearl as Cross Park Drive. Pearl's spillover development into the PAA has been previously discussed.

¶31.    Because of the proximity of Flowood and Brandon, Johnstone testified that the PAA "is not uniquely a path of growth for Pearl" and that much of Pearl's recent development has been to the south and west. However, the key question on this point is whether the PAA is in a path of growth of Pearl, regardless of whether there may be other paths of growth. Also, the fact that the PAA may lie in the path of growth of other municipalities does not negate that it also lies in a path of growth of Pearl.

¶32.    As previously mentioned, the main corridor into and out of the PAA is El Dorado Road which enters the PAA from Pearl. Further, because of the proximity of Flowood to the northwest, the airport to the north, and Brandon to the northeast, the PAA is Pearl's only possible northern path of growth. When planning the location of fire station #4, Pearl officials chose its location for its proximity to the El Dorado Road area "knowing or thinking that we may annex the El Dorado area." Also, testimony established that Pearl has improved the road

13

conditions of the city streets near the PAA, indicating the growth and activity in that direction. Additionally, Mayor Foster testified that between 1999 and the start of this trial, Pearl has experienced new commercial growth near the PAA in its airport metroplex:

> It [the metroplex] has changed tremendously. There's a retail, four or five other businesses in there. Suscom Communications moved right there (indicating). Mac Papers, which was headquartered in the state of Florida, moved right there (indicating)...There are some things going on right now. There is a Credit Union that is – I believe it's Mississippi Telco Credit Union that is moving into that area. We start construction, I understand, in the next few months. There is going to be a small retail outlet built right there, and just several other things that are under construction now, actually. Some of them may even be finished...On Crosspark Drive, there has been an office park built...there's been a convenient store constructed in the corner of Old Brandon Road and Crosspark.

Finally, he stated that the area immediately to the east of these commercial projects is a residential development finished just two years prior to the trial.

*Environmental influences*

¶33. The City of Pearl has no options for expansion to the west because of the proximity of Richland and Flowood. It has no options for expansion to the east because of the proximity of Brandon. The City produced evidence of substantial flood plains within its current boundaries, and to the south. Thus, due to the flood plains to the south, Pearl's only viable option for expansion is to the north. Because of the proximity of Flowood, the airport, and Brandon, northern expansion is limited to the PAA.

¶34. Considering these factors, and based upon the evidence in the record, we cannot say the special chancellor was manifestly wrong in finding the PAA to be in a path of growth of Pearl.

3. Potential Health Hazards

14

¶35. Some of the factors this Court has acknowledged in prior cases for this indicia of reasonableness are: (1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the area; (3) soil conditions which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage. *City of Winona,* 879 So.2d at 979 (citations omitted).

¶36. In considering the potential health hazards, the special chancellor held:

> It is undisputed that potential health hazards exist in some parts of the proposed annexation area because no central sanitary system is available. While septic tanks and private systems are workable, there is no overall monitoring or supervision, and a unified system can eliminate problems resulting from private systems, standing water, and the like. The fact that Pearl may have problems in certain areas is not controlling, as this is almost definitely true of most municipalities. Pearl may improve its own, but it certainly may improve the proposed annexation area in regard to potential health hazards.

¶37. In briefing this indicator, the Objectors focused on the current health hazards present in the City of Pearl rather than the lack of health hazards in the PAA. A proper analysis must focus on potential health hazards from sewage and waste disposal *in the proposed annexation areas*, and the trial court must consider the potential effect or impact of health hazards on residents of the PAA. *See City of Winona,* 879 So.2d at 971; *In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So.2d at 280.

¶38. The municipality is not required to show that potential health hazards in the PAA affect the citizens of the municipality. A municipality's track record for correcting and preventing health hazards within its city limits should certainly be a factor for a chancellor to consider in evaluating the potential health hazards of the PAA. However, the primary focus must be on hazards within the PAA.

15

¶39. The City called Eugene Herring, an environmental health program specialist with the Mississippi State Department of Health, to testify as an expert. Herring testified concerning numerous potential health hazards specifically identified in the PAA, created by individually owned septic tanks, sewerage discharge, and the lack of a central sewerage disposal system.

¶40. The City also called Carl Furr, an expert civil engineer, who provided the following testimony:

> [The PAA] is going to grow. This area is going to proliferate. It cannot continue to proliferate with septic tanks, or it's going to be real serious problem out there in the future. Septic tanks are something that you really look at out in rural areas of the county, rather than inside a compact area as this particular area is. It's got to be where, in this type of soil classification we have in this Jackson area, where you've got the clays, et cetera, that septic tanks simply won't continue to work for this type of built-up area. So, with the rapidly growing, it is going to be very, very difficult to continue to proliferate with septic tanks.

¶41. We cannot say that the special chancellor was manifestly wrong to find that this indicator supported the reasonableness of annexation.

### 4. Financial Ability to Make Improvements and Furnish Services

¶42. When analyzing a municipality's financial ability to make improvements and furnish services to a proposed annexation area, courts have considered several factors, including: (1) present financial condition of the municipality; (2) sales tax revenue history; (3) recent equipment purchases; (4) the financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) fund balances; (6) the City's bonding capacity; and (7) expected amount of revenue to be received from taxes in the annexed area. *City of Winona,* 879 So.2d at 980-81 (citations omitted).

¶43. After evaluating Pearl's financial stability, the special chancellor determined:

16

Pearl is in stable and excellent financial condition as reflected by the testimony of experts Ron Morgan, Demery Grubbs and Michael Slaughter. Moody's Investment Service (Exhibit P-18) reflects the same, and sales tax revenue is healthy (Exhibit P-79, Table 4). An extensive and detailed plan has been developed by Pearl to deal with the proposed annexation, which clearly shows Pearl's ability to financially handle the transaction. Pearl's fund balances continue to grow and increase, and its projections reflect the same (Exhibit P-79). Pearl's bonding capacity is strong, and the proposed annexation area would also produce revenue to Pearl. The evidence clearly indicates, speculation to the contrary, that Pearl has the financial ability to make the promised improvements and provide all services to the proposed annexation area.

¶44. The exhibits mentioned by the special chancellor clearly and concisely illustrate Pearl's financial stability. Pearl's fire chief, Lewis Waggoner, and its chief budget officer, Ronnie Morgan, testified to the continual upgrades in equipment for the fire department. Further, at the time of trial, Pearl was at 52% general operating bonded indebtedness. Specifically addressing Pearl's financial stability, Demery Grubbs, an expert in the field of municipal finance, testified that

The services identified and the facilities identified in [Pearl's Services and Facilities Plan] and the revenue that have been projected within this plan to pay for those services and facilities are well within the means and the financial ability of Pearl to provide those services,

while Mike Slaughter, an expert in the field of urban and regional planning and the associated field of civil engineering, testified that, contrary to the objectors' assertions, this annexation "is not a tax-grab to try to shore up any deficiencies in the City of Pearl" because "the City of Pearl can continue to provide the services to its current businesses and residents without this annexation." The testimony and exhibits provide evidentiary support for the special chancellor's finding that Pearl has the financial ability to make improvements and furnish services to the PAA as promised.

5. Need for Zoning and Overall Planning

17

¶45.    This Court gives chancellors a wide latitude of discretion in analyzing whether this indicator weighs against annexation.   Specifically, "[t]his Court has approved annexations even where the City does not plan to provide zoning and planning and where the County has in force its own zoning and planning ordinances." *In re Enlargement and Extension of Boundaries of City of Macon,* 854 So.2d 1029, 1041 (Miss. 2003).

¶46.    For the zoning and planning factor, the chancellor found:

> While Rankin County has recognized a need for planning, it has no zoning ordinance as testimony closed in this trial.   The proposed annexation area, as would likely any unregulated area, contains some incompatible uses, and the Court believes zoning, however unpopular, has much to commend it.   The inspection tour taken in this trial almost alone convinced the Court of the need for land use regulation afforded by zoning.   The Court recognizes that existing use may be "grandfathered" and/or "excepted" but that all other areas will likely be enhanced by zoning.   Community standards generally exert strong influences on what is contained therein, and the Court would be mildly surprised to learn that any adult entertainment establishment had located in the proposed annexation area, as objectors note.   Zoning is comprehensive, and restrictive covenants apply only to the area involved.   Zoning is often unpopular, and creates terrific legal conflicts; yet, it can and does bring about much good and, while the evidence supports a need for zoning, the inspection tour alone convinced the Court.

¶47.    The chancellor based his decision that the PAA needs zoning and overall planning on his inspection tour and other evidence in the record.   Some of the photographic exhibits reveal incompatible land uses in the PAA.   For example, Roger Heatherly, director of community development for the City of Pearl, testified that photograph six shows "an abandoned vehicle, dilapidated building, and what is appears to be a house in the background."   Photographs 21, 22, 39, and 40 reveal abandoned vehicles.   Photograph 51 "shows unsightly conditions in a residence and a building beginning to – that is partially dilapidated.   Photograph 50 has "a lot of debris...59 shows an abandoned vehicle, a TV, assorted debris, a mobile home that's not in

18

good repair, possibly abandoned." "Assorted debris scattered throughout the property" is shown in photograph 79 and "35 is showing 2 abandoned vehicles, possibly a third one in the background." Photograph 41 is an example of an incompatible land use with "a business, a mobile home and a residential, side-by-side." Johnstone testified that the newly enacted subdivision regulations for Rankin County were fairly consistent with their Pearl counterparts. She further testified "that Rankin County is moving to the International Code Council and sending their inspectors to be trained for those." While Rankin County has many building codes and sign ordinances similar to Pearl's building codes and sign ordinances, Rankin County has no zoning ordinance.

¶48. Rankin County's growing commitment to code enforcement and subdivision ordinances is further evidence of the desirability of managing development with codes, ordinances, and overall planning. Since Pearl has zoning ordinances to assist overall planning while Rankin County does not, we cannot say the special chancellor was manifestly wrong to weigh this factor in favor of approval of the annexation.

6. Need for Municipal Services

¶49. Factors helpful in determining the PAA's need for municipal services include: (1) requests for water and sewage services; (2) plan of the City to provide first response fire protection; (3) adequacy of existing fire protection; (4) plan of the City to provide police protection; (5) plan of City to provide increased solid waste collection; (6) use of septic tanks in the proposed annexation area; and (7) population density. *City of Winona,* 879 So.2d at 984 (citations omitted).

19

¶50. However, this Court has also held that "[w]hen current services are adequate, the fact that annexation may enhance municipal services should not be given much relevance, especially as here where the evidence of the likelihood of enhanced service is greatly conflicting." *Matter of Enlargement and Extension of the Mun. Boundaries of the City of Jackson,* 691 So.2d 978, 984 (Miss. 1997) (citation omitted).

¶51. In evaluating the PAA's need for municipal services, Special Chancellor Roberts[14] determined:

> The City of Pearl already provides water service to the proposed annexation area and sewer service in the Ashbury development. Since water service presently exists there, it, logically could be more easily improved and expanded. Pearl has several fire stations closer to the proposed annexation area than the nearest volunteer fire station which serves the proposed annexation area. After annexation the proposed annexation area takes Pearl's Superior Class 5 rating, rather than its present Class 10, an unprotected and the worst rating in the state. The availability of water, and a professional fire fighting department will clearly enhance the safety of the proposed annexation area. The existing population density, and the likely continued growth pattern, clearly establish a need for municipal level fire protection. The fact that tragedy has not occurred does not guarantee that it never will. While the evidence solidly establishes that the proposed annexation area is a law abiding area and that the Rankin County Sheriff's Office provides good service, it is also true that the City could and should be able to provide not only comparable but, likely, quicker service, to the small annexation area. The Court, with some law enforcement administrative experience, believes the addition of municipal service to the proposed annexation area would constitute more efficient service. A centralized sanitary sewer system would more efficiently serve the proposed annexation area, and Pearl can provide the same better than any other provider. These centralized services are needed by the residents of the proposed annexation area.

¶52. The PAA's primary fire department is the Langford Volunteer Fire Department. However, the record reflects that Pearl's fire department – which serves as the PAA's

---

[14]While serving as a distinguished Justice on this Court, Special Chancellor Roberts authored the majority opinion in *City of Jackson* and was therefore quite familiar with the concept of enhancement of municipal services already available to the proposed annexation area.

secondary provider of fire protection – is closer in proximity to the PAA and is equipped with more advanced equipment and more highly trained personnel.

¶53. Although Pearl is already the exclusive provider of potable water to the PAA, it currently provides no central sewerage disposal service to the residents of the PAA. As the provider of water for the area, Pearl installed fire hydrants and maintains and improves the system as needed to sustain the growth that the PAA has experienced. Further, Pearl does not charge Rankin County for any water that the Langford Fire Department requires for use in the PAA.

¶54. The record reflects that, other than a central sewerage collection system, the PAA already has most all of the services it needs. In evaluating the PAA's need for a central sewerage collection system and better fire and police protection, the special chancellor weighed this factor in favor of annexation. We find his decision to be a close call, but not manifestly erroneous.

### 7. Presence of Natural Barriers

¶55. The special chancellor held that "[s]ince the only natural barriers involved here are ridge lines which might impact a central sewer system, this is not an obstacle to annexation. The evidence showed no adverse effect by the ridge lines." The Objectors do not challenge the special chancellor's finding in this regard.

### 8. Past Performance

¶56. This Court has approved the examination of a municipality's record of keeping promises made in previous annexations as some indication of whether or not the municipality would fulfill the promises to the proposed annexation area. *See* ***Extension of Boundaries of City of***

21

*Ridgeland v. City of Ridgeland*, 651 So.2d 548, 560 (Miss. 1995); *Matter of Extension of Boundaries of City of Jackson*, 551 So.2d 861, 867 (Miss. 1989); *Extension Boundaries of City of Moss Point v. Sherman*, 492 So.2d 289, 290 (Miss. 1986); *City of Biloxi v. Cawley*, 332 So.2d 749, 751 (Miss. 1976).

¶57.    In analyzing Pearl's past performance, Special Chancellor Roberts ascertained:

> The evidence indicates that Pearl has performed well, not perfectly, in the past, as indicated by its 1978 Mississippi Supreme Court case 365 So.2d 952 (Miss. 1978).  All promises and city services listed have been addressed in a forward and progressive fashion in terms of water, sewer, fire and police protection, waste disposal, streets, and so forth.  The trailer parks, grandfathered in, remain unsightly and a problem, but, legally, the City has few options in this regard. Overall, Pearl's past performance passes the acid test, and all city officials indicated, credibly, that good performance would continue.

¶58.    In Pearl's annexation of three parcels of land in 1978, it promised the following list of promised improvements: prompt police, fire and pest protection; and within six years, grading, draining, and improving existing streets; installing water lines and fire hydrants; installing sewer lines; and installing street lighting. *In re Extension of Boundaries of City of Pearl,* 365 So.2d 952, 956 (Miss. 1978).

¶59.    Pearl presented evidence that these conditions had been substantially satisfied as well as continued progress on promises made to residents annexed in 1999.  In fact, as to Pearl's past performance in correcting and/or improving drainage situations since incorporation, Carl Furr, the City's expert civil engineer, testified:

> [t]he City of Pearl has been one that we represent that has been very aggressive and has had – we've had ongoing wastewater projects ever since 1974 to address annexed areas and to address existing areas where we would upgrade and add any wells and tanks to the system.  Pearl has been very aggressive in their public works program and it continues to do so...The City of Pearl was a forerunner for Congress to pass appropriations of in excess of $10 million.  The only city, the

22

first city in Mississippi to do so, to go in and approve and riprap drainage ditches in the city of Pearl. It was a huge program administered by the then Soil Administration Service. And, as a result of that, other cities in the state saw what Pearl did and then that kind of proliferated from there. But they were forerunners in major drainage improvements. We've had a drainage plan in place since the early '70s that we have continued to work to channelize and replace inadequate structures that were put in prior to the annexation, and that's one of the reasons why it is good to be able to control that under an annex – I mean under a municipality, than it is out in the country or county where you don't have a good tool to do that.

The Objectors focus on trailer parks and flooding problems within Pearl's city limits as proof of Pearl's bad past performance. However, evidence presented at trial suggested that the trailer parks were "grandfathered in" when Pearl was incorporated and that some of the flooding problem is due to the unregulated growth in a flood plain prior to incorporation. While Pearl has not perfectly fulfilled its promises and obligations from past annexations, the record supports the special chancellor's finding that it has substantially done so.

9. Impact on Residents and Property Owners

¶60. Regarding the impact on residents and other property owners, the special chancellor found:

The Court certainly sympathizes with the proposed annexation area objectors who wish to remain unincorporated, and the Court respects their apprehensions that their taxes will increase and that their land values will decrease. The proposed annexation area residents wish to remain as is, with no "citified" encroachment. Realistically, the area has changed, and is likely changing daily; the proposed annexation area is in a metropolitan area, and it is no longer rural, though it may seem so. It is growing and will do so whether annexed or not; annexation alone will not destroy any character already in existence, but it will plan for what is yet to be. Taxes will likely increase somewhat, but the benefit derived therefrom should exceed the cost. It is also just as probable that land values will increase rather than decrease; much of this may depend upon residents' conduct and expectations. Proposed annexation area children will not be required to change schools. Much of the impact is perceived, which is very important, but if the perceptions should turn into harsh reality, which is,

23

hopefully, unlikely, there are other avenues of relief for proposed annexation area residents. Many objectors indicated that they simply did not like Pearl, did not want to be a part of it, and just found the idea repulsive, so to speak. The truth of the matter seems to be that no other municipality wants the proposed annexation area, and the proposed annexation area is too small and too close to Pearl to be overlooked. While the Court understands and respects the views of the proposed annexation area residents, the facts and the law applicable thereto favor Pearl in this situation. The actual economic impact on the proposed annexation area residents should be beneficial, rather than detrimental, but other avenues are open to them, if needed.

¶61. The Objectors' primary argument under this indicator is that annexation by Pearl will decrease their property values. Over the City's objection, Johnstone, the Objectors' expert witness in the field of regional and municipal planning, testified concerning a survey she conducted by calling eleven central Mississippi realtors and asking their opinion of the impact of annexation by Pearl on property values. Johnstone admitted that she had never before compiled such a survey and was unaware of other urban planners compiling a similar survey. Thus, the City's objection would seem to have merit, and it is apparent the Special Chancellor placed little value on the uncrossexamined hearsay opinions of the eleven realtors.

¶62. Further evidence of a negative economic impact would be an increase in taxes and a connection fee for sewer services. This Court has addressed the impact of higher taxes in many prior annexation cases and has consistently held that the prospect of a tax increase is "insufficient to defeat annexation." *In re Extension of Boundaries of City of Hattiesburg,* 840 So.2d 69, 93 (Miss. 2003) (*citing In re Enlargement and Extension of Municipal Boundaries of the City of Biloxi*, 744 So.2d at 284).

¶63.    Therefore, this Court is left with questionable evidence of a perceived future drop in property values, a connection fee for central sewerage collection and disposal, and the subjective revulsion expressed by approximately twenty residents of the PAA.

¶64.    As to the property values and connection fee, we find the special chancellor was well within his discretion to determine they did not weigh heavily against the proposed annexation. As to the desires of the residents of the PAA, we again point out that the Legislature has not seen fit to allow them to vote. Unless and until it does, we must refrain from doing so, as we are powerless to grant judicially what the Legislature withholds from its statutes.

### 10. Impact on the Voting Strength of Protected Minority Groups

¶65.    The special chancellor held "[w]ithout contradiction, this factor favors annexation as it will have no adverse impact on the voting strength of African Americans, or any other minorities." The Objectors do not challenge that finding.

### 11. Benefits Enjoyed by the PAA because of its Proximity to the Municipality

¶66.    After analyzing whether, because of their close proximity to Pearl, the residents of the PAA enjoy benefits without paying corresponding taxes, Special Chancellor Roberts held:

> This factor appears somewhat equal on a "*quid pro quo*" basis, because the proposed annexation area residents pay their taxes, *et cetera*, and they pay for whatever they purchase in Pearl, if they do. Speculatively, however, as growth and development occur, the tie between the proposed annexation area and existing Pearl is going to remain, and this factor certainly does not preclude annexation. While the proposed annexation area has far more residents than the actual objectors, it seems reasonable that a few, some, or maybe, many, do benefit already from the proximity. It is clear that those objectors who testified denied any romance of proximity, but it also seems just as clear to the Court that the several hundred who did not object may very well romance the proximity.

¶67. It does not appear the special chancellor placed much weight on this factor. We find little in the record to indicate, one way or the other, whether the residents of the PAA enjoy untaxed benefits from the City. The PAA is surrounded on all sides by four separate municipalities. Residents of the PAA have access to shopping in, and pay sales tax to, each of the municipalities. While the residents of the PAA clearly enjoy benefits because of their proximity to the various municipalities, we find it would be difficult from the record before us to determine which of those benefits are due to the proximity with Pearl, as opposed to Brandon, Flowood, or Jackson.

### 12. Other Factors

¶68. As an additional factor, the Objectors focused on the proposed annexation's probable impact on schools. To this factor, Special Chancellor Roberts responded "[a]t this time, there is no impact of annexation on schools, as school district lines do not automatically change with municipal annexation. No other factors oppose annexation."

¶69. With the repeal of Miss. Code Ann. § 37-7-611, a municipal annexation no longer mandates a change in school district boundary lines. Having raised no other additional factors to oppose annexation and finding that annexation does not automatically change a neighborhood's school district, it is our opinion that the Special Chancellor was not in error in holding that no other factors oppose annexation.

**CONCLUSION**

¶70.    Pearl does not deny that it is still fighting to correct some of the problems that have been present since incorporation due to its unregulated growth prior to incorporation.    When Pearl was incorporated in 1973, it "was a hodge-podge of buildings, mobile homes, roads, and sewer conveniences."    *City of Pearl,* 365 So.2d 952, 957 (Miss. 1978).    In 1978 when this Court approved Pearl's annexation of three adjacent areas, we recognized the City of Pearl's desire to regulate these areas before they too became "densely populated with a 'crazy quilt' situation of development which will require uprooting and a new start in the matter of water, streets, sewer, and other necessities that people have."    *Id.*    Similarly, Pearl has expressed a desire to regulate growth in the PAA to ease its transition into the municipality.

¶71.    Based upon the City's burden of proving the reasonableness of a proposed annexation, and in concert with our requirement, absent an abuse of discretion, to leave undisturbed a chancellor's finding of reasonableness, we affirm the Special Chancellor's judgment approving the petition for annexation.

¶72.    **AFFIRMED.**

**WALLER AND COBB, P.JJ., EASLEY, CARLSON AND GRAVES, JJ., CONCUR. SMITH, C.J., DIAZ AND RANDOLPH, JJ., NOT PARTICIPATING.**