# 1IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-AN-01574-SCT

*IN THE MATTER OF THE ENLARGEMENT AND EXTENSION OF THE CORPORATE LIMITS OF THE CITY OF MADISON, MISSISSIPPI: RONALD RUSSELL, KELLY KERSH, CHARLES WARWICK, TOM JOHNSON, RICHARD DAVIS, HARLAN SISTRUNK AND FRANK BELL*

*v.*

*CITY OF MADISON, MISSISSIPPI*

*AND*

*CITY OF MADISON*

*v.*

*RONALD RUSSELL, BILL ROBERTSON, KELLY KERSH, CHARLES WARWICK, TOM JOHNSON, STAN PATTERSON, RICHARD DAVIS, GEORGE ARDELEAN, LISA MARKHAM, HARLAN SISTRUNK, FRANK BELL AND LARRY SPENCER*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/31/2006 |
| TRIAL JUDGE: | HON. JASON H. FLOYD, JR. |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | T. JACKSON LYONS |
| ATTORNEYS FOR APPELLEE: | JAMES L. CARROLL |
| | MYLES A. PARKER |
| | MELISSA ANNELLE ROSE |
| | JACOB THOMAS EVANS STUTZMAN |
| | C. JOHN HEDGLIN |
| NATURE OF THE CASE: | CIVIL - MUNICIPAL BOUNDARIES & ANNEXATION |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: AFFIRMED - 04/03/2008 |
| MOTION FOR REHEARING FILED: | |

MANDATE ISSUED:

**BEFORE WALLER, P.J., CARLSON AND LAMAR, JJ.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     The City of Madison petitioned the Chancery Court of Madison County to enlarge and extend its existing boundaries to incorporate an area situated to the north and northwest of the existing city limits.  The special chancellor approved all of the proposed annexation area except for approximately 2.5 square miles to the north of the current city limits.  As a result of the special chancellor's decision, the objectors to the annexation have appealed to us and the City of Madison has cross-appealed.  We find that, under the totality of the circumstances, the special chancellor's findings are reasonable and supported by substantial and credible evidence.  Thus, we affirm the judgment of the Madison County Chancery Court on both direct appeal and cross-appeal.[1]

---

[1]We are not unmindful of the fact that we granted leave for St. Dominic Health Services, Inc., to filed an amicus curiae brief during the pendency of this appeal, and St. Dominic's amicus brief is before us. St. Dominic asserts that it owns 51.2 acres of land within the 2.5-square- mile area excluded from annexation by the special chancellor; that "it has a legitimate interest in the outcome" of the City of Madison's cross-appeal; that after the annexation trial in this case, it filed a certificate of need application concerning the construction of a 75-bed hospital within the excluded annexation area; and that it adopts the City's argument on cross-appeal, asserting error on the part of the special chancellor in excluding the 2.5-square-mile area from the annexation area.  However, we must consider this appeal from the record before us based on the oral and documentary evidence presented at trial and the applicable law.

2

# FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     At a public meeting on April 2, 2002, an ordinance expanding the boundaries of the City of Madison was unanimously adopted by the city's Board of Aldermen and signed by Mayor Mary Hawkins Butler.  Based on this action, on April 3, 2002, the city filed in the Madison County Chancery Court its "Petition for the Approval, Ratification and Confirmation of the Enlargement and Extension of the Municipal Boundaries of the City of Madison, Mississippi" (Petition) pursuant to Mississippi Code Annotated Section 21-1-27, et seq.  Through this Petition, the city sought to annex approximately 15.80 square miles of land comprised of sixteen parcels located primarily to the north and northwest of the current city limits.

¶3.     On April 24, 2002, Kelly Kersh, Ronald Russell, Bill Robertson, Charles Warwick, Tom Johnson, Stan Patterson, George Ardelean, Richard Davis, Lisa Markham, Harlan Sistrunk, and Frank Bell (the "Objectors") filed their Objection to the city's Petition. Additionally, on May 30, 2002, Larry Spencer filed his separate Objection to the city's Petition. Thereafter, on June 7, 2002, Billy and Thelma Carpenter caused an objection letter to be filed in this matter on their behalf.

¶4.     After the chancellors of the Eleventh Chancery Court District (of which Madison County is a part), recused themselves, this Court's chief justice, on May 27, 2003, entered an order appointing former chancellor Jason H. Floyd as a special judge to preside and conduct proceedings in this matter.

¶5.     By early January 2005, there had been numerous trial settings and continuances, but pursuant to previous notice, a trial was scheduled for February 7, 2005, on the city's annexation petition.  However, on January 14, 2005, the chancery court conducted a hearing on a motion to dismiss which had been filed by the Objectors. By order dated February 7, 2005, and entered on February 10, 2005, the special chancellor denied the Objectors' motion to dismiss; and likewise, the special chancellor allowed the city to amend its petition, since there was an error in the description of the city's entire boundary as changed.  Based on the special chancellor's ruling, the city was required to file an amended annexation petition and re-publish and re-post the annexation notice as required by statute; therefore, the scheduled hearing was once again continued and subsequently set for trial on September 26, 2005.

¶6.     On August, 12, 2005, the city filed its amended annexation petition and notice of hearing, caused process to be issued, and re-posted and re-published notice as required by statute; however, once again, the hearing had to be continued because the amended petition contained errors in the description of the proposed annexation area (PAA), as well as the entire boundary as changed.  By order dated September 20, 2005, and entered on September 23, 2005, the special chancellor, *inter alia*, granted leave to the city once again to amend its petition to correct these errors in the legal descriptions; likewise, the special chancellor reset the trial for January 9, 2006. On November 17, 2005, the city filed its second amended annexation petition, and re-published and re-posted the annexation notice as required by statute.

4

¶7.    Eventually, after a twelve-day trial which spanned a period of time from January 9, 2006, through January 26, 2006, and in which numerous lay witnesses and expert witnesses testified in support of, and in opposition to, the city's annexation efforts, the Madison County Chancery Court took this matter under advisement and in due course entered its detailed Findings of Fact and Conclusions of Law (FOFCOL) on August 8, 2006.  In its FOFCOL, the chancery court found the annexation to be reasonable except as to three of the sixteen parcels of land.  As to the three parcels of land which were not judicially approved for annexation, the special chancellor stated:

> The Court finds, however, that within the PAA, the following three parcels have experienced little if any spillover and further there are no roads or streets extending into these areas.  The first area is that portion of Section 31 that lies east of Bozeman Road and west of Interstate 55 and also Section 32 and Section 33, all in Township 8 North, Range 2 East, all within the PAA.  While this land may become reasonable for annexation at some future date, the Court finds that due to lack of development and access roads, this time has not yet arrived.
>
> The other two areas are portions of Parcel 10 and Parcel 11 located in Sections 10 and 11, Township 7 North and Range 1 East.  There are no primary roads or spillover development in these two areas.  The northern most portion of Parcel 11, lying to the west of Livingston Road, is undeveloped with limited access.  However, Livingston Road, a well-traveled transportation corridor, transverses its entire eastern boundary, and no objection was made to it being annexed.  In fact, the testimony is that the landowner requests its annexation.  The court finds that annexation of this area as well as that portion of Parcel 10 which is located in Section 14, Township 7 North, Range 1 East are reasonable and they are allowed.  Annexation of the remainder of Parcels 10 and 11 is unreasonable and is denied.  The owner uses this as a farm and vehemently objects to its annexation.  (Internal citations omitted).

On September 5, 2006, the special chancellor entered a Final Judgment consistent with the FOFCOL.  From this Final Judgment, the Objectors filed their notice of appeal on September

5

15, 2006, asserting that the chancery court's decision to approve the majority of the city's annexation plan was manifestly wrong and not supported by substantial credible evidence. On the same day, the city cross-appealed, asserting that the chancery court had erred in failing to also approve for annexation the three parcels comprising approximately 2.5 square miles of land lying to the north of the current city boundaries.

**DISCUSSION**

¶8.     Although the parties couch the issue(s) in different terminology, in the end, a chancellor's decision concerning annexation is reviewed by this Court on appeal through the lens of reasonableness. Stated differently, we have in the past acknowledged "the judiciary's limited role in determining whether a municipality's exercise of its legislatively granted authority to enlarge its boundaries via annexation is reasonable, given the totality of the circumstances." *Lamar County v. City of Hattiesburg (In re Extension of the Boundaries of Hattiesburg)*, 840 So. 2d 69, 73 (Miss. 2003). *See also In re Extension of Boundaries of City of Winona*, 879 So. 2d 966, 971 (Miss. 2004). When a chancellor determines an annexation to be reasonable, this Court will reverse on appeal only when the "chancellor's decision is manifestly wrong and is not supported by substantial and credible evidence." *Id.* (citing *City of Hattiesburg*, 840 So. 2d at 81). Furthermore,

> [w]here there is conflicting, credible evidence, we defer to the findings below. Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless this Court can say that from all the evidence that such findings are manifestly wrong, given the weight of the evidence. We may only reverse where the Chancery Court has employed erroneous legal standards or where we are left with a firm and definite conviction that a mistake has been made.

6

*Id.* (citing *Bassett v. Town of Taylorsville*, 542 So. 2d 918, 921 (Miss. 1989)). *See also In re Enlargement and Extension of Municipal Boundaries of City of Biloxi*, 744 So. 2d 270, 277 (Miss. 1999); *McElhaney v. City of Horn Lake*, 501 So. 2d 401, 403 (Miss. 1987); *Extension of Boundaries of City of Moss Point v. Sherman*, 492 So. 2d 289, 290 (Miss. 1986); *Enlargement of Boundaries of Yazoo City v. City of Yazoo City,* 452 So. 2d 837, 838 (Miss. 1984); *Extension of Boundaries of City of Clinton*, 450 So. 2d 85, 89 (Miss. 1984).

¶9.     In reviewing the chancellor's decision as to whether a proposed annexation is reasonable, this Court takes into account twelve indicia of reasonableness: (1) the municipality's need to expand; (2) whether the area sought to be annexed may be deemed to be reasonably within a path of growth of the city; (3) the potential health hazards from sewage and waste disposal in the proposed annexation area; (4) the municipality's financial ability to make improvements and furnish the promised municipal services; (5) the need for zoning and overall planning in the proposed area of annexation; (6) the need for municipal services in the area proposed to be annexed; (7) the existence *vel non* of natural barriers between the city and the proposed annexation area; (8) the past performance and time element concerning the city's providing of services to its current residents; (9) the economic impact or any other type impact of the annexation upon those persons who live or own property in the area proposed for annexation; (10) the impact of the annexation upon the voting strength of protected minorities; (11) whether property owners and all inhabitants of the area proposed for annexation have in the past, and will in the future, unless annexed, enjoy the economic and social benefits of the municipality because of their reasonable

7

proximity to the corporate limits of the municipality, without paying their fair share of taxes; and (12) any other factors that may or may not affect the issue of the reasonableness of the proposed annexed area. *City of Biloxi*, 744 So. 2d at 278; ***In re Enlargement and Extension of Municipal Boundaries of City of Madison***, 650 So. 2d 490, 494 (Miss. 1995). With that in mind, "'the ultimate determination must be whether the annexation is reasonable under the totality of the circumstances.'" *City of D'Iberville v. City of Biloxi*, 867 So. 2d 241, 249 (Miss. 2004) (citing ***In re Corporate Boundaries of the Town of Mantachie***, 685 So. 2d 724, 726 (Miss. 1996) (quoting ***Robinson v. City of Columbus (In re Extension of the Boundaries of the City of Columbus***), 644 So. 2d 1168, 1172 (Miss. 1994)).

¶10. As to the Objectors' direct appeal, we now restate the issue for clarity in discussion.

> **I. WHETHER THE SPECIAL CHANCELLOR ERRED IN DETERMINING THAT ANNEXATION OF MOST OF THE PROPOSED AREA WAS REASONABLE UNDER THE TOTALITY OF THE CIRCUMSTANCES.**

> *A. THE NEED TO EXPAND*

¶11. When determining whether a city seeking an extension of its boundaries has a reasonable need for expansion, this Court has considered many factors which may include, but do not have to include: (1) spillover development into the proposed area of annexation; (2) the city's internal growth; (3) the city's population growth; (4) the city's need for development of land; (5) the need for planning in the proposed annexation area; (6) increased traffic counts in the proposed area; (7) the need to maintain as well as expand the city's tax base; (8) limitations due to the geography and any surrounding cities; (9) land remaining

8

vacant within the municipality; (10) environmental influences; (11) the city's need to exercise control over the area proposed to be annexed; and (12) increase in new building permit activity. *City of Winona*, 879 So. 2d at 974 (quoting *In the Matter of the Enlargement and Extension of the Boundaries of the City of Macon v. City of Macon*, 854 So. 2d 1029, 1034-35 (Miss. 2003)).

¶12.    The Objectors mainly argue that the City of Madison has enough vacant land within the city limits to expand development without annexing the proposed area of annexation (PAA).  Currently, 67.9% of the City of Madison is totally developed.  Only 1,275 acres of land is vacant, unconstrained, developable land.  This Court has "declined to set an absolute amount of usable vacant land that would prevent annexation." *City of Hattiesburg,* 840 So. 2d at 85.  As such, "the fact that there may be some other vacant lands already available in the city does not prohibit annexation nor does it require that an indicia be found to be against the community proposing annexation." *City of Winona*, 879 So. 2d at 973.  In fact, in the city's 1995 annexation, the city had slightly more than 50% of usable vacant land, and this Court approved the annexation. *City of Madison*, 650 So. 2d at 496.

¶13.    Alan David Hoops, Director of Community Development and Interim Director of the Building Permits Department and Code Enforcement in the City of Madison, was offered at trial as an expert in the field of community development, planning and zoning.  Hoops testified that residential and commercial growth has spilled over into the PAA.  As of the date of trial, there were seventy commercial, residential, and recreational development plans within the City of Madison and just outside the city limits in the PAA.  Of the seventy

9

development plans, forty-three were within the city and twenty-seven were within the PAA. Developers are forced to build in the PAA because of a lack of vacant, developable land within the city limits. Even the Objectors' planning expert, Joseph A. Lusteck, acknowledged at trial that a large portion of the PAA consisted of spillover development as a result of increased demand for commercial land in the area. Further evidence revealed that the city's physical ability to expand was limited to the south by the City of Ridgeland and to the east by the Ross Barnett Reservoir.

¶14. Additionally, Hoops and other city department heads were actively involved in the preliminary plat phase and layout phase of both residential and commercial development projects in the PAA. They had worked extensively with the developers, landscape architects, engineers, and planners for new developments to ensure consistency, quality design, and quality development in the PAA.

¶15. The city's population has increased significantly over the past several years. As such, commercial building permits and residential building permits have increased. Since 1996, 214 commercial building permits and 1900 residential building permits have been issued by the city. Additionally, there have been traffic increases both in the city and in the PAA. From 1990 until 2004, traffic on Main Street in the City of Madison increased by 191.3%, and traffic on Highway 463 in the PAA increased by 319.4%. The chancellor found that the city's zoning and other related ordinances were more comprehensive than the county's and that the city was in a superior position to implement and enforce the ordinances. Lastly, the

evidence revealed that methods of sewage and trash disposal would be greatly improved with the city's expansion and control.

¶16.    Since the special chancellor's decision took into account many of the above-enumerated factors, and the decision is supported by the substantial, credible evidence, we find the special chancellor's findings for this indicium were reasonable.

### B.    PATH OF GROWTH

¶17.    This Court has outlined several factors which may be considered in determining whether a proposed annexation area is within a municipality's path of growth: (1) spillover development in the proposed area of annexation; (2) the adjacency of the proposed annexation area to the city; (3) limited area available for further expansion; (4) interconnection via transportation corridors; (5) increased urban development in the proposed annexation area; (6) geography; and (7) subdivision development.  *City of Winona*, 879 So. 2d at 977 (other citations omitted).  When looking at the path of growth, "a city need only show that the areas desired to be annexed are in 'a' path of growth [and] this does not mean that the area is 'the most urgent or even the city's primary path of growth.'" *City of Winona*, 879 So. 2d at 977 (citing *City of Hattiesburg*, 840 So. 2d at 86-87).

¶18.    We held in *City of Macon*:

> The test for evaluating the reasonableness of a chosen path of growth is "whether an area is in a path of growth, not necessarily a City's primary path of growth." *In re City of Horn Lake*, 630 So. 2d 10, 19 (Miss. 1993).  This Court has further stated that "our law gives municipalities the discretion, based on convenience and necessity, to choose between various paths of growth by annexation." *Ritchie v City of Brookhaven*, 217 Miss. 860, 65 So. 2d 436,

11

439 (1953). The law is clear that the annexation area must be in "a" path of growth[,] not "the" path or "only" path of growth.

*City of Macon,* 854 So. 2d at 1029.

¶19. This Court stated in ***Enlargement & Extension of the Municipal Boundaries of City of Meridian v. City of Meridian***, 662 So. 2d 597, 612-13 (Miss. 1995), that the most important factors when determining reasonableness of the path of growth are "the adjacency of the proposed annexation area to the city, accessibility of the proposed annexation area by city streets, and spillover of urban development into the proposed annexation area." ***Id.*** at 612-13.

¶20. In today's case, the evidence reveals that the PAA is immediately adjacent to the city and is accessible by public streets, highways and roads. Mississippi Highway 463 runs directly from the city's downtown area past the Reunion development, which is currently located in the PAA. Subdivisions including Annandale, Ingleside, Twelve Oaks and Windsor Hills are on both sides of Highway 463 and are directly connected to it. Madison Avenue is a main, east-west corridor and extends both through the city and the PAA. Highland Colony Parkway, which turns into Bozeman Road at Highway 463, is another primary transportation corridor.

¶21. In addition, the PAA is experiencing significant spillover of urban development in the contiguous areas around the periphery of the city. The city also presented evidence which supported its assertion that the city's path of growth is primarily to the north and to the west

12

of the existing city because the city is surrounded by the Ross Barnett Reservoir to the east, the city of Ridgeland to the south, and the city of Canton to the north.

¶22.    Based on the testimony presented at trial, we find that the special chancellor's findings that this indicium of reasonableness has been met in favor of annexation are supported by the substantial, credible evidence.

### C.    POTENTIAL HEALTH HAZARDS

¶23.    This Court has set out several sub-factors which may be considered when determining if the indicium of potential health hazards has met.  These factors include, but again, are not limited to: (1) potential health hazards from sewage and waste disposal; (2) a large number of septic tanks in the PAA; (3) soil conditions which are not conducive to on-site septic systems; (4) open dumping of garbage; and (5) standing water and sewage.  *City of Winona*, 879 So. 2d at 979 (citing *City of Biloxi*, 744 So. 2d at 280; *In re Corporate Boundaries of Town of Mantachie*, 685 So. 2d 724, 727 (Miss. 1996); *City of Jackson v. City of Ridgeland*, 651 So. 2d 548, 558 (Miss. 1995)).

¶24.    A review of the record reveals that many parts of the PAA do not have the benefit of sanitary sewage.  In fact, evidence was presented to show that failing on-site wastewater treatment facilities are located throughout the PAA, and many residents are using septic tanks, despite the fact that they are impractical and ineffective due to unsuitable soils in the area.  The tanks often do not function properly; as a result, sewage tends to pool, and residents illegally dump their raw sewage into ditches.  Not only is illegal dumping a violation of state law, but it also presents significant potential health hazards to the residents

13

of the PAA. The City of Madison proposed two potential plans to cure the PAA's defective sewage system and presented evidence that it could financially provide for the implementation of the plan selected in its Services and Facilities Plan.

¶25. Additionally, trash pickup in the PAA occurs only once a week, which contributes to uncollected waste in the area, which in turn contributes to the spread of disease. The city presented evidence that it plans to address this problem by providing garbage collection twice per week.

¶26. The special chancellor's findings that this indicium favored annexation are supported by the evidence presented at trial, as well as by his observations from a personal tour of both the area within the current city boundaries and the PAA.

D. *FINANCIAL ABILITY*

¶27. In considering the city's financial ability to make the improvements and provide the services as promised, this Court may consider several sub-factors to determine if this indicium has been met: (1) the present financial condition of the city; (2) the city's sales tax revenue history; (3) the city's recent equipment purchases; (4) the city's financial plan and department reports proposed for implementing and fiscally carrying out the annexation; (5) the fund balances of the city; (6) the city's bonding capacity; and (7) expected amount of revenue to be received by the city from taxes in the annexed area. *City of Winona*, 879 So. 2d at 980-81.

¶28. The evidence presented at trial revealed that the City of Madison is in good financial condition and that the city has the ability to keep its commitments, all according to Mike

14

Slaughter, the city's urban-planning expert. At trial, Slaughter calculated the city's past yearly revenues and expenditures. The City of Madison has experienced a healthy ending balance every year since 2000. In 2000, the ending fund balance was $847,900; in 2001, $612,582; in 2002, $875,780; in 2003, $941,599 and in 2004, $1,461,481.

¶29. Furthermore, Slaughter projected the city's financial status for the first five years after annexation and concluded that the city would continue to be financially sound after the annexation. The city has numerous financing options available including: general obligation bonds, Mississippi Development bank bonds, special assessment bonds, short term notes, tax increment financing bonds, revenue bonds, and lease financing, among others.

¶30. Currently, the City of Madison has a capacity of $7.4 million for general obligation bonds. Under the 15% Rule, the city's bonding capacity after annexation will increase from $22.06 million in 2007 to $46.65 million by 2011. Under the 20% Rule, the city's bonding capacity will increase from $35.04 million in 2007 to $66.66 million by 2011. In 2005, the City of Madison reduced its millage rate from 29.8 mils to 28.8 mils.

¶31. The special chancellor concluded that the city is in a strong financial condition and is well-equipped to implement the Services and Facilities Plan as adopted by the mayor and board of aldermen. The Objectors conceded in their brief that the City of Madison has the financial ability to provide municipal services to the PAA. We conclude that the special chancellor's finding that annexation is reasonable from a financial standpoint is supported by the substantial, credible evidence presented during the trial.

15

### E. THE NEED FOR ZONING AND OVERALL PLANNING

¶32. The special chancellor found, after considering the testimony and evidence presented by both parties, that the zoning and planning ordinances of the City of Madison are superior to that of the county and it would be beneficial for the city's ordinances to be enacted in the PAA. However, the special chancellor did not conclude that the Madison County zoning and planning ordinances were inadequate; therefore, while it may be beneficial to enact the city's ordinances, the special chancellor could not say if the need existed for the municipal-level codes and regulations in the PAA.

¶33. In *City of Ridgeland*, 651 So. 2d at 559, this Court upheld an annexation even though the county already had a suitable zoning ordinance in place. Thus, the fact that a county may have zoning ordinances does not mean that an area of the county cannot be annexed. *Id.* Also, the City of Madison's Zoning and Planning Commission already has been involved in the planning and development of some of the commercial and residential areas in the PAA. Therefore, we find reasonable the special chancellor's determination that the city's zoning and planning ordinances are superior to those of the county.

### F. THE NEED FOR MUNICIPAL SERVICES

¶34. In determining if annexation is reasonable under this indicium, this Court may consider certain factors such as: (1) the city's plan to provide first-response fire protection; (2) the adequacy of existing fire protection; (3) the city's plan to provide police protection; (4) any requests for water and sewage services; (5) the city's plan to provide increased solid-waste collection; (6) use of septic tanks in the PAA; and (7) the population density. *City of*

16

***Winona***, 879 So. 2d at 984 (citing ***City of Macon***, 854 So. 2d at 1041-42) (other citations omitted).

¶35.    The Objectors' main argument on direct appeal is directed at this indicium of reasonableness.  Essentially, the Objectors contend that the residents of the PAA stand to receive little or nothing from this annexation.  The Objectors assert that the city is unable to create a viable plan for a central sewer system, which can be considered as the principal benefit of an annexation.  The Objectors cite ***In re Extension of the Boundaries of the City of Columbus***, 644 So. 2d 1168, 1171 (Miss. 1994) for the proposition "that municipalities must demonstrate through plans and otherwise, that residents of annexed area will receive something of value in return for their tax dollars in order to carry the burden of showing reasonableness." ***Id.*** at 1171.  However, the special chancellor concluded that the City of Madison provided two viable options for sewer service to the PAA.  Furthermore, the chancellor concluded that, because the PAA is rapidly increasing in population, the county is not equipped to provide the needed level of municipal fire protection, police protection, trash collection, and water services, while, on the other hand, the City of Madison is fully equipped to provide such services.

¶36.    The record reveals that Madison County has a volunteer fire department, and that the City of Madison acts as a mutual-aid responder to the PAA.  On the other hand, the city has a professional, full-time fire department, and several volunteer firefighters.  Thus, according to the evidence, the city provides first-response fire and rescue protection to the PAA, although it is not contractually bound to do so.  As such, most of the PAA has been assigned

17

a fire rating of Class 10 by the Mississippi Rating Bureau, while the city is rated Class 6. The evidence further reveals that upon annexation, the PAA's rating would be changed to Class 6, resulting in lower base insurance premiums for homeowners.

¶37. Evidence presented at trial revealed that, although the Madison County Sheriff's Department provides adequate police protection in the PAA, municipal-level law enforcement provided by the City of Madison would greatly benefit the annexed area as further development occurs. The testimony at trial revealed that, as more commercial and residential developments are built, traffic volume increases, and the County will be unable to adequately enforce posted speed limits since the Sheriff's Office is not equipped with radar speed-detection devices.

¶38. Further, the record reveals that there are currently 0.07 sworn officers per square mile in the county, while there are 3.56 sworn officers per square mile in the city. The city has 2.92 sworn officers per 1,000 people, and the county's average is 0.61 officers per 1,000 people. Upon annexation, the city plans to add sixteen officers to its department, including an animal-control officer and a fully-equipped animal-control truck, as well as four fully-equipped vehicles, an investigative car, and equipment and uniforms for these additional officers.

¶39. The methods of sewage and trash disposal being used in the PAA were shown to be inadequate. Therefore, the areas of the PAA in which the city does not already provide municipal-level sewer services are growing rapidly, and these areas would benefit from central sewage. The city has proposed two sanitary sewer improvement plans, Option 1 and

Option 2, in its Facilities and Services Plan. The special chancellor found both options to be viable plans for the provision of sewer service to the PAA.

¶40. While the Objectors strongly dispute their need for municipal-level services, the city has shown by substantial, credible evidence that it can provide the PAA with an abundance of municipal-level services. Based upon the testimony and evidence presented at the hearing, the special chancellor's findings that this indicium favors annexation are reasonable.

G. *NATURAL BARRIERS*

¶41. The special chancellor found that "there are no natural barriers that would make it prohibitive for the City of Madison to provide the full range of municipal services and to complete its infrastructure investment, including water and sewer services, to the PAA." In past annexation cases, we have considered "natural or man-made conditions that may impede a city's expansion or render the provision of services impossible or prohibitively expensive, including flood plains, interstate highway, and county lines." *City of D'Iberville v. City of Biloxi*, 867 So. 2d at 257 (internal citations omitted).

¶42. In today's case, the annexation areas are contiguous to the city with unimpeded access into and out of the areas from the city. While I-55 does run through the existing city, it is not a barrier between the city and the PAA. The special chancellor's findings that this indicium of reasonableness supports annexation are supported by the substantial credible evidence.

19

*H.   THE PAST PERFORMANCE AND TIME ELEMENT INVOLVED IN THE CITY'S PROVISION OF SERVICES TO ITS PRESENT RESIDENTS*

¶43.   The record supports the special chancellor's findings that the city has a good track record of providing timely services to newly annexed areas.  For example, in the city's most recent annexation, the city promised to build a new fire station on Highway 463.  The fire station was in fact built and is now servicing not only the city but residents of the PAA.  In addition, the city provided municipal-level sewer service to the vast majority of the area annexed in 1995.  This is not to mention that all commercial establishments and residences are connected to a municipal-level water system.   Thus, the special chancellor's determination that this indicium of reasonableness weighs heavily in favor of annexation is supported by substantial, credible evidence presented at trial.

*I.   IMPACT (ECONOMIC OR OTHERWISE) ON THOSE IN THE PROPOSED ANNEXATION AREA*

¶44.   "'The mere fact that residents in the PAA will have to pay more taxes is insufficient to defeat annexation,'" *City of Hattiesburg*, 840 So. 2d at 93 (quoting *In re Enlargement and Extension of Municipal Boundaries of the City of Biloxi*, 744 So. 2d 270, 284 (Miss. 1999)).  We stated in *City of Jackson*:

> The Court is required to balance the equities by comparing the City's needs to expand and any benefits accruing to residents from the annexation with any adverse impact, economic or otherwise, which will probably be experienced by those who live in and own property in the annexation area.  The mere fact that residents and landowners will have to start paying city property taxes is not sufficient to show unreasonableness.

*Matter of Boundaries of City of Jackson*, 551 So. 2d 861, 867-68 (Miss. 1989).

¶45. The residents and property owners in the PAA will receive valuable services in return for paying city taxes. The evidence at trial showed that the residents and property owners in the PAA will receive such municipal services as guaranteed, municipal-level fire protection, police protection, animal control, garbage collection, mosquito spraying, domestic/firefighting water, sanitary sewer, and street maintenance and lighting. Furthermore, the residents and property owners in the PAA will receive the benefit of properly enforced comprehensive municipal planning and zoning. The special chancellor's finding that this indicium of reasonableness weighs in favor of annexation is supported by substantial, credible evidence.

## J. IMPACT OF THE ANNEXATION UPON THE VOTING STRENGTH OF PROTECTED MINORITY GROUPS

¶46. Under this indicium of reasonableness, the special chancellor held:

> The City of Madison's annexation will not have any significant impact on the voting strength of any minority group. After annexation of the PAA, the City of Madison's minority voting population will increase by 2.1%. No minority or other objector suggested otherwise. The Court finds that this indicium of reasonableness weighs in favor of annexation.

Of significant import, not one minority objector appeared at trial to contest the annexation based upon a dilution in minority voting strength. This Court stated in *City of Columbus* "that where voting strength is in dispute, we do not afford great weight in cases where the issue is not raised by one with standing." *City of Columbus,* 644 So. 2d at 1180. Thus, we cannot say the special chancellor was manifestly wrong in finding that this indicium supported the reasonableness of the annexation.

21

### K. ENJOYMENT OF ECONOMIC AND SOCIAL BENEFITS OF THE MUNICIPALITY WITHOUT PAYING A FAIR SHARE OF TAXES.

¶47. The special chancellor held:

> As indicated in a prior opinion of this Court, making a determination of what is considered a fair share of taxes would involve a subjective evaluation of all the factors involved. Since, however, taxation is a legislative act and this Court is of the opinion that so long as the residents and property owners in the PAA pay the taxes imposed upon them by the authorities that the payment of those taxes would be considered their fair share.

We find *In the Matter of the Extension of the Boundaries of the City of Pearl v. City of Pearl*, 908 So. 2d 728, 743 (Miss. 2005) persuasive. In *City of Pearl*, this Court agreed with the special chancellor, who stated:

> This factor appears somewhat equal on a "*quid pro quo*" basis, because the proposed annexation area residents pay their taxes, *et cetera*, and they pay for whatever they purchase in Pearl, if they do. Speculatively, however, as growth and development occur, the tie between the proposed annexation area and existing Pearl is going to remain, and this factor certainly does not preclude annexation. While the proposed annexation area has far more residents than the actual objectors, it seems reasonable that a few, some, or maybe, many, do benefit already from the proximity. It is clear that those objectors who testified denied any romance of proximity, but it seems just as clear to the Court that the several hundred who did not object may very well romance the proximity.

*Id.* at 743. The PAA is contiguous with the city. Thus, residents and property owners in the PAA benefit by having access to city roads, shops, restaurants, churches, and recreational facilities. Many of the residents of the PAA enjoy lower fire insurance rates because of the proximity to a municipality with a Class 6 fire rating. Although the county does not pay taxes for maintaining the full-time fire department in the city, the citizens of the PAA get the benefit of first-response fire protection. Therefore, from this record, we cannot find that the

22

special chancellor is manifestly wrong in concluding that this indicium favors annexation.

### L. ANY OTHER FACTORS

¶48.   The special chancellor held "that there is no other factor that may suggest reasonableness or unreasonableness." Thus, he did not place much weight, if any, on this twelfth indicium of reasonableness. While the Objectors focus on the mayor's "autocratic conduct" towards the residents of the PAA when she stated in a public forum "I'm going to annex you whether you like it or not,"and they believe this behavior should weigh against annexation, we cannot find from the record that the mayor's public statement should be outcome-determinative on the issue of the reasonableness of the city's annexation efforts.

¶49.   Since the special chancellor did not place significant weight on this indicium of reasonableness and at best found the indicium to be neutral, we cannot hold that the special chancellor is manifestly wrong.

¶50.   In sum, as to the direct appeal of the Objectors, we find from the record before us that the special chancellor did not err in his determination that the annexation of a major portion of the PPA was reasonable under the totality of the circumstances.

## ON CROSS-APPEAL

**II.   WHETHER THE SPECIAL CHANCELLOR ERRED IN REFUSING TO GRANT THE ANNEXATION OF THE THREE PARCELS COMPRISING 2.5 SQUARE MILES OF LAND TO THE NORTH OF THE CURRENT CITY OF MADISON.**

¶51.   We now consider this issue as raised by the City of Madison on cross-appeal. Succinctly stated, the city's position is that the special chancellor should have approved for

23

annexation the entire PAA, failing which, the special chancellor erred in finding that portions of the PAA were not reasonable for annexation.

¶52.   The Madison County Chancery Court found, after considering the twelve indicia of reasonableness, that under the totality of the circumstances the proposed annexation was reasonable, with two exceptions:

   (1)   That part of Section 31, Township 8 North, Range 2 East that lies east of Bozeman Road and west of I-55; all of Section 32, Township 8 North, Range 2 East and all of Section 33, Township 8 North, Range 2 East, lying in the PAA, all being in Parcel Number 14 of the Proposed Annexation Area.

   (2)   [T]hat portion of Parcel Number 11 including and lying east of Livingston Road and that portion of Parcel Number 10 lying in Section 11, Township 7 North, Range 1 East.  All of the above within the Proposed Annexation Area.

To support his determination, the special chancellor held the above three parcels of land "have experienced little if any spillover and further there are no roads or streets extending into these areas."  In its cross-appeal, the city claims that spillover development and access roads are but only two **sub-factors** to consider under the "path-of-growth" indicium of reasonableness.  As such, the city asserts that the special chancellor ignored the other eleven indicia of reasonableness and focused on one.

¶53.   As previously noted, this Court has held:

   The twelve indicia of reasonableness are not to be treated as twelve distinct tests, rather, the chancellor must weigh the totality of the circumstances, using these twelve indicia of reasonableness only as a guide. . . . "This Court has frequently reiterated its position that the factors to be considered are not to be treated as separate, independent tests but rather indicia of reasonableness, and

24

that the ultimate determination must be whether the annexation is reasonable under the totality of the circumstances."

***City of Pearl***, 908 So. 2d at 733 (internal citations omitted).

¶54. As to the special chancellor's findings concerning the portions of the PAA he excluded from annexation, we find that there is substantial, credible evidence to support his exclusion of the three parcels of land. From the record, the special chancellor was justified in finding that, without access roads or spillover development, the majority of the other indicium of reasonableness are irrelevant. Without access roads, there is no development, residential or commercial, on the three excluded parcels of land. If no one lives or works on the three parcels, then there is no need for municipal-level services such as fire protection, police protection, central sewer, and the like. When considering the record before us, the special chancellor had substantial credible evidence before him to find that, while the three parcels of excluded land may be in the city's path of growth, the time is not ripe for its annexation. Since we hold the special chancellor's findings that, with two exceptions, the proposed annexation is reasonable, we conclude that the issue raised by the city via this cross-appeal has no merit.

## CONCLUSION

¶55. For the reasons stated, we affirm on both direct appeal and cross-appeal, the Final Judgment of the Madison County Chancery Court.

¶56. **ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: AFFIRMED.**

**SMITH, C.J., WALLER AND DIAZ, P.JJ., GRAVES, RANDOLPH AND LAMAR, JJ., CONCUR. DICKINSON, J., CONCURS IN PART AND DISSENTS IN**

25

**PART WITHOUT SEPARATE WRITTEN OPINION.  EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION**.